UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **ROMEO KREINBERG,** | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **-against-** | : |
| | : |
| **THE DOW CHEMICAL COMPANY AND** | : |
| **ANDREW N. LIVERIS**, | : |
| | : |
| **Defendants.** | : |
| | : |
| | : |

Case No.  07-CV-4557 (VM)
ECF Case

<u>**DEFENDANT THE DOW
CHEMICAL COMPANY'S
ANSWER, COUNTERCLAIM, AND
DEMAND FOR JURY TRIAL**</u>

       This action centers on Romeo Kreinberg's serious breaches of his fiduciary duties to, and

contracts with, The Dow Chemical Company ("Dow" or the "Company"), and the Company's

subsequent statements about its proper termination of Kreinberg's employment due to his

misconduct.

       Defendant The Dow Chemical Company hereby sets forth its Answer and Counterclaim

to the Complaint of Plaintiff J. Pedro Kreinberg.  All statements of which Dow does not have

personal knowledge are upon information and belief.

**<u>KREINBERG COMPLAINT</u>**

       1.       This case arises from Defendants' pretextual termination of Romeo Kreinberg, a
distinguished executive and 30-year employee of Dow, and the defamation campaign used to
conceal the reasons behind it.  In a scheme driven by Defendant Andrew Liveris, who viewed
Kreinberg as a threat to his corporate control, Kreinberg was falsely accused of grave disloyalty
to a company he had served faithfully his entire professional life.  Defendants' defamatory
statements attacked Kreinberg's character and integrity as a businessman, causing serious harm
to a reputation and career previously notable only for admirable achievement and the respect
Kreinberg earned in the international business community.

       **<u>DOW ANSWER</u>**:  Dow admits that Plaintiff Kreinberg attempts to bring claims

for defamation and breach of contract, but denies that it has engaged in any acts or omissions in

this state or any other state that would entitle Plaintiff to any relief whatsoever under state or federal law and further denies that Plaintiff is entitled to any relief whatsoever. Dow further admits that Defendant Kreinberg joined Dow in 1977 and rose to become one of Dow's most senior and trusted executives. Dow denies that there was any scheme to accuse Kreinberg; denies that Kreinberg was falsely accused; and denies that Kreinberg faithfully served Dow. Dow denies the remaining allegations of Paragraph 1 of the Complaint.

## KREINBERG COMPLAINT

2.     The events leading to Kreinberg's defamation began on April 8, 2007, when a British tabloid reported that J.P. Morgan was advising a consortium of Middle Eastern investors who targeted Dow for a buy-out. The next day, at Liveris' request, J.P. Morgan's CEO Jamie Dimon flew from his New York offices to Midland, Michigan to meet Liveris at the Dow Club.

**DOW ANSWER:**  Dow admits that on April 9, 2007, Jamie Dimon met with Andrew Liveris and others at the Dow Club for a previously-scheduled dinner to discuss J.P. Morgan Chase's past and ongoing relationship with Dow. Dow denies that this dinner was the result of an April 8 tabloid article. Insofar as the allegations of Paragraph 2 refer to the contents of other documents, those documents speak for themselves. Dow denies the remaining allegations of Paragraph 2 of the Complaint.

## KREINBERG COMPLAINT

3.     During dinner, Liveris asked Dimon if J.P. Morgan -- which maintains a longstanding relationship with Dow -- was aware of any plans or discussions relating to an acquisition of some or all of Dow's business, and if so, whether Dow employees were involved. Dimon responded to Liveris' inquiry the next day, on April 10, 2007.

**DOW ANSWER:** Dow admits that at this dinner to discuss J.P. Morgan Chase's past and ongoing business relationship with Dow, there was also discussion about J.P. Morgan Chase's knowledge of plans or communications relating to an acquisition of some or all of Dow's business. Dow admits that the involvement of Dow employees was also discussed; and

2

that the next day, April 10, Mr. Dimon provided additional information about Dow employees

participating in communications about an acquisition of some or all of Dow's business.  Dow

denies the remaining allegations of Paragraph 3 of the Complaint.

## KREINBERG COMPLAINT

4.      On April 12, less than 48 hours later, Kreinberg was called to a meeting attended by Liveris, Dow's General Counsel Charles Kalil, Board members Arnold Allemang and Paul Stern, and Martin Lipton of the New York law firm Wachtell Lipton Rosen & Katz.

**DOW ANSWER:**  Dow admits that Kreinberg was asked to attend a meeting on

April 12, 2007, which was also attended by Andrew Liveris, Dow's General Counsel Charles Kalil,

Dow Board members Arnold Allemang and Paul Stern, and Martin Lipton of the law firm Wachtell

Lipton Rosen & Katz.  Dow denies the remaining allegations of Paragraph 4 of the Complaint.

## KREINBERG COMPLAINT

5.      When Kreinberg arrived, Liveris accused him of having participated in a "conspiracy" with investment banks and foreign governments to sell Dow.  Kreinberg was then terminated, having been refused the opportunity to challenge the charge against him or review the evidence purportedly supporting it.  Defendants dispensed with the 30-year career of a distinguished and devoted executive in just over five minutes.

**DOW ANSWER:**  Dow admits that Kreinberg was terminated for serious

misconduct and breaching his fiduciary duties.  Dow denies the remaining allegations of

Paragraph 5 of the Complaint.

## KREINBERG COMPLAINT

6.      Immediately thereafter Dow issued a press release announcing Kreinberg's termination.  The press release stated that Kreinberg was involved in "highly inappropriate" and "unauthorized discussions with third parties about the potential acquisition of the Company." The press release further stated these discussions constituted "a clear violation of Dow's Code of Business Conduct." Press Release, The Dow Chemical Company, The Dow Chemical Company Announces Executive Terminations (Apr. 12, 2007) (attached hereto as Exhibit A).

**DOW ANSWER:**  Dow admits that on April 12, 2007 it released a statement to the press.  Insofar as the allegations of Paragraph 6 of the Complaint refer to the contents of other documents, those documents speak for themselves.  Dow denies the remaining allegations of Paragraph 6 of the Complaint.

**KREINBERG COMPLAINT**

7.    Defendants repeated these and similar allegations over the next several weeks, claiming to have "irrefutable" evidence demonstrating Kreinberg had shopped the Company, which it received from a "highly credible person" on April 10, two days before Kreinberg was fired.

**DOW ANSWER:**  Dow admits that it made statements concerning the matter after April 12, 2007.  Insofar as the allegations in Paragraph 7 refer to the contents of other documents, those documents speak for themselves.  Dow denies the remaining allegations in Paragraph 7 of the Complaint.

**KREINBERG COMPLAINT**

8.    As a result of these and other falsehoods published by Defendants, Kreinberg was branded a "traitor" to Dow in publications around the globe.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 8 of the Complaint.

**KREINBERG COMPLAINT**

9.    Defendants' statements about Kreinberg and the reasons for his termination were false and defamatory, and Defendants knew them to be false and defamatory at the time they were made.

**DOW ANSWER:**  Dow denies that the statements were false.  Dow denies that the statements were defamatory.  Dow denies the remaining allegations in Paragraph 9 of the Complaint.

**KREINBERG COMPLAINT**

      10.    Kreinberg has not "shopped" Dow or otherwise participated in a conspiracy to sell or acquire the Company, in whole or in part.  Likewise, Kreinberg has not engaged in "highly inappropriate" or "unauthorized discussions" in violation of Dow's Code of Business Conduct.

      **DOW ANSWER:**  Dow denies the allegations in Paragraph 10 of the Complaint.


**KREINBERG COMPLAINT**

      11.    Defendants have no basis to state or imply otherwise.  To the contrary, on information and belief, the "source" to which Defendants have referred is Jamie Dimon and/or J.P. Morgan, who informed Liveris that Kreinberg's interaction with J.P. Morgan was unstructured and informal, and no different from those typically held among bankers and industry businessmen.  Dimon never advised Liveris that Kreinberg was part of a conspiracy to sell the Company, or that Kreinberg otherwise identified an intention or suggested he had the authority to sell Dow.  Quite the opposite, J.P. Morgan representatives were told by Kreinberg that he had no such authority.

      **DOW ANSWER:**  Dow admits that among its sources of information were

employees of J.P. Morgan Chase, including Mr. Dimon; and that Defendants were advised of

unauthorized communications involving Kreinberg, Reinhard and others on the topic of the

acquisition of some or all of Dow.  Dow denies the remaining allegations of Paragraph 11 of the

Complaint.


**KREINBERG COMPLAINT**

      12.    Nonetheless, Defendants falsely and publicly accused Kreinberg of having breached his duties to the Company, without having conducted any reasonable or fair investigation or granting him the opportunity to controvert this claim.

      **DOW ANSWER:**  Dow denies the allegations in Paragraph 12 of the Complaint.


**KREINBERG COMPLAINT**

      13.    Defendants' intentional defamation damaged the reputation and career of an executive who has served Dow faithfully.  As a result, Defendants have caused lasting and profound harm to Kreinberg and to Company shareholders, who will suffer the loss of a loyal and valued manager's services.

      **DOW ANSWER:**  Dow denies the allegations in Paragraph 13 of the Complaint.

**KREINBERG COMPLAINT**

   14.  Plaintiff Romeo Kreinberg is a permanent U.S. resident who resides in Michigan and Florida.

     **DOW ANSWER:**  Dow admits that Kreinberg is a resident of Florida.  Dow

denies that Kreinberg is domiciled in Michigan.  Dow is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 of the

Complaint, and therefore denies them.

**KREINBERG COMPLAINT**

   15.  Defendant The Dow Chemical Company ("Dow") is a Delaware Corporation that at all times relevant to this action did business in the State of New York.  Dow maintains its principal place of business at 2030 Dow Center, Midland, Michigan 48674.

     **DOW ANSWER:**  Dow admits that it is a Delaware corporation with its principal

place of business at 2030 Dow Center, Midland, Michigan 48674; Dow has customers in New

York; and Dow executives travel to New York for business.  Dow denies the remaining

allegations of Paragraph 15 of the Complaint.

**KREINBERG COMPLAINT**

   16.  Defendant Andrew N. Liveris is, and at all times relevant to this action was, Chief Executive Officer, President, and Chairman of the Board of The Dow Chemical Company.

     **DOW ANSWER:**  Dow admits that Mr. Liveris is the Chief Executive Officer,

President, and Chairman of the Board of The Dow Chemical Company.

**KREINBERG COMPLAINT**

   17.  This Court has jurisdiction over Defendants pursuant to CPLR 301.

      **DOW ANSWER:**  Dow admits that it is not presently challenging

personal jurisdiction with respect to Dow.

**KREINBERG COMPLAINT**

18.    Venue in this Court is proper pursuant to CPLR 503(a) and (c).

**DOW ANSWER:**  Dow denies the allegations in Paragraph 18 of the Complaint.

**KREINBERG COMPLAINT**

19.    Kreinberg was born in Croatia and raised in Argentina.  He received an undergraduate degree from the University of Buenos Aires in 1974.

**DOW ANSWER:**  Dow is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies them.

**KREINBERG COMPLAINT**

20.    In 1975, Kreinberg moved to Germany to accept a position in marketing and development with a plastic and steel parts manufacturer in the automotive industry.

**DOW ANSWER:**  Dow is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

**KREINBERG COMPLAINT**

21.    In 1977, Kreinberg was recruited by Dow Germany as a sales representative in the extruded polystyrene foam division.

**DOW ANSWER:**  Dow admits that in 1977, Kreinberg accepted a position as a sales representative in the extruded polystyrene division.  Dow denies the remaining allegations of Paragraph 21 of the Complaint.

**KREINBERG COMPLAINT**

22.    By 1982, after several promotions, Kreinberg moved to Switzerland to manage marketing strategy development for specialty polyurethane products produced by Dow's

European, Middle Eastern and African operations. During Kreinberg's tenure, division business more than doubled, from $40 million to over $100 million.

**DOW ANSWER:** Dow admits that Kreinberg held a series of sales, marketing, business operations and commercial management positions in Europe until 1992, when he was named general manager for Dow Italy and vice president of Dow Europe. Dow denies the remaining allegations of Paragraph 22 of the Complaint.

## KREINBERG COMPLAINT

23.     In 1985 Dow again asked Kreinberg to relocate, this time to Italy, to become the Company's regional marketing manager. By 1992, Kreinberg was general manager of Dow Italy and vice president of Dow Europe. In this capacity, Kreinberg helped negotiate the purchase of Buna, an East German petrochemical complex, which has proved to be one of Dow's most successful business deals.

**DOW ANSWER:** Dow admits that Kreinberg held a series of sales, marketing, business operations and commercial management positions in Europe until 1992, when he was named general manager for Dow Italy and vice president of Dow Europe. Dow denies the remaining allegations of Paragraph 23 of the Complaint.

## KREINBERG COMPLAINT

24.     Kreinberg was promoted to global vice president for polyethylene in 1995. Under his leadership, this segment of Dow's business doubled in size and accounted for more than $3 billion in operational cash flow and $1 billion of the Company's net profit.

**DOW ANSWER:** Dow admits that in 1995 Kreinberg was made global vice president for polyethylene. Dow denies the remaining allegations of Paragraph 24 of the Complaint.

## KREINBERG COMPLAINT

25.     Recognizing his contributions to the Company, in 2000 Dow promoted Kreinberg to business group president for polyolefins and elastomers. Kreinberg continued a proven record of increasing sales, gaining new customers and improving productivity while running this $6.1 billion portfolio.

**DOW ANSWER:** Dow denies the allegations in Paragraph 25 of the Complaint.

**KREINBERG COMPLAINT**

26.     In 2003, Dow appointed Kreinberg a member of the Office of the Chief Executive and promoted him to senior vice president for the plastics business portfolio.  Kreinberg was charged with leading a business group of over 9,800 employees in 47 countries, which generated $17 billion in net revenue.

**DOW ANSWER:**  Dow admits the allegations in Paragraph 26 of the Complaint.

**KREINBERG COMPLAINT**

27.     In 2005, Kreinberg was elevated to executive vice president of Dow's performance plastics and chemical business portfolio.  In this capacity, Kreinberg lead 15,000 employees in 145 countries generating $21.8 billion, or 44% the Company's total sales revenue.

**DOW ANSWER:**  Dow admits that Kreinberg was named executive vice

president of Dow's performance plastics and chemical business portfolio.  Dow further states

that the size of this portfolio has varied over time.

**KREINBERG COMPLAINT**

28.     In addition to these operational responsibilities, Kreinberg was appointed director at Dow Corning and the Oman Petrochemical Industries Company ("OPIC"), a joint venture between Dow and the country of Oman.

**DOW ANSWER:**  Dow admits the allegations in Paragraph 28 of the Complaint.

**KREINBERG COMPLAINT**

29.     Kreinberg's efforts on the Company's behalf were recently again recognized when, on March 13, 2007, he was named to a five-person executive leadership committee focused on defining the Company's strategic direction, prioritizing its investment agenda and setting its financial plans.

**DOW ANSWER:**  Dow admits that on March 13, 2007 Kreinberg was named to

a five-person Executive Leadership Committee, which was to concentrate on defining the

Company's strategic direction, prioritizing its investment agenda, establishing enterprise-wide

policy and setting financial plans and performance metrics.  Dow denies the remaining

allegations in Paragraph 29 of the Complaint.

**KREINBERG COMPLAINT**

30.    In his more than 30 years of dedicated service to the Company, Kreinberg moved his family to five different countries to accept increasingly more prestigious positions and assignments at Dow.  Not once did Kreinberg refuse or fail to effectively execute a new challenge posed by his employer.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 30 of the Complaint.

**KREINBERG COMPLAINT**

31.    In 2000, Dow CEO William Stavropolous announced his resignation, and the Company selected Michael Parker as his successor.

**DOW ANSWER:**  Dow admits the allegations in Paragraph 31 of the Complaint.

**KREINBERG COMPLAINT**

32.    Two years later, after several quarters of negative cash flow, the Dow Board removed Parker.  It reinstated Stavropolous, then Chairman of Dow's Board, as interim-CEO until a permanent replacement was identified.

**DOW ANSWER:**  Dow admits that the Dow Board removed Michael Parker in

December 2002 and named Mr. Starvopolous as CEO.  Dow denies the remaining allegations in

Paragraph 32 of the Complaint.

**KREINBERG COMPLAINT**

33.    Kreinberg was one of a number of candidates who met with Board members to discuss the Chief Executive position; however, soon after Stavropolous' installation, Liveris was ushered into the position of President and Chief Operating Officer.  Thereafter, Liveris ascended to the positions of CEO and Chairman.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 33 of the Complaint.

**KREINBERG COMPLAINT**

34.    As CEO, Liveris was required to work closely with Kreinberg, who remained a well-respected senior executive.  Kreinberg created and maintained many of Dow's largest and most lucrative customer relationships throughout Europe and the Middle East.  This successful track record continued undiminished during Liveris' tenure.

**DOW ANSWER:** Dow denies the allegations in Paragraph 34 of the Complaint.

**KREINBERG COMPLAINT**

35.    Indeed, in February 2007, two months prior to his termination, Kreinberg received an e-mail from Director Arnold Allemang praising his "passionate leadership" and anticipating "future profitability and growth" as a result of Kreinberg's work.

**DOW ANSWER:** Insofar as the allegations of Paragraph 35 refer to the contents of documents, those documents speak for themselves. Dow denies the remaining allegations of Paragraph 35 of the Complaint.

**KREINBERG COMPLAINT**

36.    Despite this performance, or perhaps because of it, Liveris viewed Kreinberg as a threat. The loyalty Kreinberg garnered from his division, one of Dow's largest and most successful, coupled with Kreinberg's willingness to challenge the opinions held by his CEO, was anathema to Liveris and his management style.

**DOW ANSWER:** Dow denies the allegations in Paragraph 36 of the Complaint.

**KREINBERG COMPLAINT**

37.    In light of Kreinberg's achievements, however, Liveris had no basis to terminate Kreinberg for a failure to perform his job responsibilities. The CEO needed a different angle or hook supporting his ouster of the well-regarded executive.

**DOW ANSWER:** Dow denies the allegations in Paragraph 37 of the Complaint.

**KREINBERG COMPLAINT**

38.    By letter dated March 23, 2007, just days after Kreinberg was appointed to the Company's Executive Committee, Liveris threatened to fire him within three months if he failed to adjust his "negative body language" and "attitude." If Kreinberg refused, Liveris stated, his "links with Dow" would be severed.

**DOW ANSWER:** Insofar as the allegations of Paragraph 38 refer to the contents of documents, those documents speak for themselves. Dow denies the remaining allegations of Paragraph 38 of the Complaint.

11

**KREINBERG COMPLAINT**

39.    Within three weeks of issuing this ultimatum, Liveris manufactured a more expedient basis to follow through on his threat.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 39 of the Complaint.

**KREINBERG COMPLAINT**

40.    On April 8, 2007, a British tabloid reported that J.P. Morgan was advising "a consortium of Middle Eastern investors and American buyout firms" that were "[placing the] finishing touches [on] an approach for U.S. giant Dow Chemical." Lawrie Holmes, *U.S. Giant on Verge of $50bn Record Buyout*, SUNDAY EXPRESS, Apr. 8, 2007, at 11.

**DOW ANSWER:**  Insofar as the allegations of Paragraph 40 refer to the contents of documents, those documents speak for themselves.  Dow denies the remaining allegations of Paragraph 40 of the Complaint.

**KREINBERG COMPLAINT**

41.    The next day, Dow's management responded to the buy-out rumor, issuing a press release advising shareholders that the Company was not the subject of an offer.  Press Release, The Dow Chemical Company, Dow Voices Support for Company Strategy (Apr. 9, 2007).

**DOW ANSWER:**  Dow admits that it issued a press release on April 9, 2007. Insofar as the allegations of Paragraph 41 refer to the contents of documents, those documents speak for themselves. Dow denies the remaining allegations of Paragraph 41 of the Complaint.

**KREINBERG COMPLAINT**

42.    At Liveris' behest, Jamie Dimon, J.P. Morgan's CEO, met him at the Dow Club for dinner that evening.  Liveris asked Dimon if J.P. Morgan was aware of any plans or discussions relating to the acquisition of some or all of Dow's business, and whether Dow employees were involved.

**DOW ANSWER:**  Dow admits that on April 9, 2007, Jamie Dimon met with Liveris and others at the Dow Club for a previously-scheduled dinner to discuss J.P. Morgan Chase's past and ongoing business relationship with Dow; that there was also discussion about

J.P. Morgan Chase's knowledge of plans or communications relating to an acquisition of some or all of Dow's business; and that the involvement of Dow employees was also discussed. Dow denies the remaining allegations of Paragraph 42 of the Complaint.

**KREINBERG COMPLAINT**

43. On information and belief, Dimon reported back to Liveris the next day. As discussed below, Defendants distorted and misrepresented the substance of this report to support the malicious defamation that followed it.

**DOW ANSWER:** Dow admits that Mr. Dimon called Mr. Liveris on April 10, 2007, and that Mr. Dimon provided additional information about Dow employees participating in unauthorized communications concerning an acquisition of some or all of Dow's business. Dow denies the remaining allegations in Paragraph 43 of the Complaint.

**KREINBERG COMPLAINT**

44. On April 12, 2007, two days after Liveris spoke with Dimon, Kreinberg was called to a 7 a.m. meeting attended by Liveris, Dow's General Counsel Charles Kalil, Board members Arnold Allemang and Paul Stem, and Martin Lipton of the New York law firm Wachtell Lipton Rosen & Katz. On information and belief, Lipton had been retained by Dow to develop a "poison pill" to ward off takeover attempts.

**DOW ANSWER:** Dow admits that Kreinberg attended a 7 a.m. meeting on April 12, 2007, which was also attended by Liveris, Kalil, Allemang, Stern and Lipton. Dow denies the remaining allegations of Paragraph 44 of the Complaint.

**KREINBERG COMPLAINT**

45. During this meeting, Liveris accused Kreinberg of "conspiring" with investment banks and foreign governments to sell Dow, adding that this alleged conduct was a breach of Kreinberg's duties to the Company. Kreinberg asked to see the evidence purportedly supporting these allegations, a request that the Company denied.

**DOW ANSWER:** Dow admits that at the April 12, 2007 meeting Dow informed Kreinberg that it had learned of his serious misconduct and breaches of his fiduciary duties. Dow denies the remaining allegations of Paragraph 45 of the Complaint.

## KREINBERG COMPLAINT

46.    Instead, General Counsel Kalil advised Kreinberg, who had not been told the purpose of the meeting or to have his counsel present, that he should quietly resign in favor of a "benevolent" severance from the Company.

**DOW ANSWER:** Dow denies the allegations of Paragraph 46 of the Complaint.

## KREINBERG COMPLAINT

47.    Kreinberg declined, and was summarily terminated.

**DOW ANSWER:** Dow admits that Kreinberg refused to resign as an officer of Dow. Dow admits that with the full support of its Board of Directors, Dow terminated Kreinberg's employment. Dow denies the remaining allegations of paragraph 47 of the Complaint.

## KREINBERG COMPLAINT

48.    Within hours Dow issued a press release that remains on its website to this day, stating that Kreinberg engaged in "highly inappropriate" and "unauthorized discussions with third parties about the potential acquisition of the Company" constituting "a clear violation of Dow's Code of Business Conduct." (See Exh. A.)

**DOW ANSWER:** Dow admits that the press release was posted on its website on April 12, 2007. Insofar as the allegations of Paragraph 48 of the Complaint refer to the contents of other documents, those documents speak for themselves.

## KREINBERG COMPLAINT

49.    Liveris added that he was "greatly saddened by the disrespect shown by [Kreinberg]," but that Dow's case was "absolutely watertight," and Liveris had "not a minute of doubt" that the Company took "absolutely appropriate action" in rapidly firing him. *Id.*; Jack Kaskey, *Dow*

*Case on Ex-Executives Is Watertight, Liveris Says*, (Bloomberg), Apr. 18, 2007,
http://vvvv.bloomberg.com/apps/news?pid=newsarchive&sid=a6wJuMkDpXTo

      **DOW ANSWER:**  Dow admits that a *Bloomberg* article was published on April

18, 2007.  Insofar as the allegations of Paragraph 49 of the Complaint refer to the contents of

documents, those documents speak for themselves.  Dow denies the remaining allegations in

Paragraph 49 of the Complaint.


## KREINBERG COMPLAINT

    50.    Liveris thereafter worked tirelessly to convey confidence in the case against
Kreinberg and the propriety of the Company's decision, stating that Dow "had irrefutable
evidence [of his] inappropriate behavior." Francesco Guerra, *Dow Chief Defends Dismissal Decision*,
FIN. TIMES, Apr. 18, 2007, at 28.  When asked if he was satisfied with the "the quality of [such]
evidence," Liveris unequivocally stated: "Capital Y, capital E, capital S.  Yes. Why would we act in
any other way? We were absolutely clear." *Id.*

      **DOW ANSWER:**  Dow admits that the *Financial Times* published an article on

April 18, 2007.  Insofar as the allegations of Paragraph 50 of the Complaint refer to the contents

of documents, those documents speak for themselves.  Dow denies the remaining allegations in

Paragraph 50 of the Complaint.


## KREINBERG COMPLAINT

    51.    Dow, too, stated that Kreinberg had shopped the Company, noting that it received this
information "from a 'highly credible person' on April 10, two days before [Kreinberg was]
fired." Jack Kaskey, *Dow Case on Ex-Executives Is Watertight, Liveris Says*, (Bloomberg), Apr. 18,
2007, *supra.*  According to Dow, "[i]n terms of . . . [Kreinberg's] activities, . . . [he] had been
involved in a period of several months with various parties in a number of different locations to
discuss the potential acquisition of Dow Chemical Company." *Fired Dow Chemical Advisor Denies
Wrongdoing,* Manufacturing.Net (Apr. 17, 2007),
http://www.manufacturing.net/article.aspx?id=139741.

      **DOW ANSWER:**  Dow admits that a *Bloomberg* article was published on April

18, 2007; and a *Manufacturing.Net* article was published on April 17, 2007.  Insofar as the

allegations of Paragraph 51 of the Complaint refer to the contents of documents, those

documents speak for themselves.  Dow denies the remaining allegations in Paragraph 51 of the

Complaint.

**KREINBERG COMPLAINT**

52.    Defendants' false and defamatory statements about Kreinberg generated additional national and international press.  Kreinberg was branded a corporate "traitor" to the company he served for over 30 years.  *See, e.g.,* Evelyn M. Rusli, *Dow Chemical Ousts Traitors,* FORBES.COM, Apr. 12, 2007, http://www.forbes.com/markets /2007/04/12/dow-chemical-firesmarkets-equity-cx er 0412markets04.html.   Liveris himself acknowledged the magnitude of coverage, glibly stating: "Books will be written about it." *Face Value: The Chief Executive's Dilemma, Is Andrew Liveris of Dow Chemical Right to Resist the Temptations of Private Equity?,* 950 THE ECONOMIST 86, Apr. 26, 2007, *supra.*

**DOW ANSWER:**  Dow denies that the statements were false and defamatory.

Dow admits that a *Forbes.com* article was published on April 12, 2007; and an article was

published in *The Economist* on April 26, 2007.  Insofar as the allegations of Paragraph 52 of the

Complaint refer to the contents of documents, those documents speak for themselves.  Dow

denies the remaining allegations in Paragraph 52 of the Complaint.

**KREINBERG COMPLAINT**

53.    The public statements made by Defendants concerning Kreinberg and the basis for his termination are false, and were known by Defendants to be false at the time they were made.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 53 of the Complaint.

**KREINBERG COMPLAINT**

54.    Kreinberg did not shop the Company.  Nor did Kreinberg, who was a senior executive required to interact with a broad range of industry players in the United States and abroad in the ordinary course, participate in unauthorized meetings outside the purview of his responsibility or otherwise violate Dow's Code of Business Conduct.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 54 of the Complaint.

**KREINBERG COMPLAINT**

55.     Defendants' statements to the contrary are false, without basis, and defamatory. Indeed, Defendants -- who admit no investigation was undertaken prior to Kreinberg's public termination -- "simply [made] contact with **one** individual" who purportedly provided information supporting their precipitous conduct. *See* Paul Wyche, *Pair Stood to Benefit from Sale,* SAGINAW NEWS, Apr. 13, 2007, IA (emphasis added).

**DOW ANSWER:**  Paragraph 55 of the Complaint states legal conclusions and

contains allegations that are not simple and direct averments as required by Federal Rule of Civil

Procedure 8(e) and, thus, no responsive pleading is required.  To the extent that a response is

required, Dow denies the allegations in Paragraph 55 of the Complaint.

**KREINBERG COMPLAINT**

56.     On information and belief, this "one individual" is Jamie Dimon of J.P. Morgan.

**DOW ANSWER:**  Paragraph 56 of the Complaint states allegations that are not

simple and direct averments as required by Federal Rule of Civil Procedure 8(e) and, thus, no

responsive pleading is required.  To the extent that a response is required, Dow denies the

allegations in Paragraph 56 of the Complaint.

**KREINBERG COMPLAINT**

57.     Dimon, however, never told Defendants that Kreinberg participated in a plan, expressed an intention, or otherwise stated he had authority to sell the Company.  To the contrary, on information and belief, Dimon advised Liveris that his investment bank has had informal contact with Dow employees, including Kreinberg, among others, but that these interactions were of the nature and quality of those commonly held among bankers and industry businessmen.  Dimon further informed Liveris that these Dow employees told J.P. Morgan that they had no authority to sell the Company.  Finally, Dimon requested that Liveris fully advise Dow's Board of his report, cautioning that Liveris should not jump to any conclusions or take any further action on these issues without careful thought and investigation.

**DOW ANSWER:**  Dow admits that among its sources of information were

employees of J.P. Morgan Chase, including Mr. Dimon; and that Defendants were advised of

unauthorized communications involving Kreinberg, Reinhard and others on the topic of the

acquisition of some or all of Dow. Dow denies the remaining allegations in Paragraph 57 of the Complaint.

**KREINBERG COMPLAINT**

58.    Nonetheless, Defendants intentionally distorted and misrepresented to Dow colleagues and the media the statements made by Dimon and/or J.P. Morgan regarding Kreinberg and his role in the alleged buy-out conspiracy.

**DOW ANSWER:** Dow denies the allegations in Paragraph 58 of the Complaint.

**KREINBERG COMPLAINT**

59.    Defendants did this to manufacture a pretext for Kreinberg's termination, cutting short the employment of a distinguished and devoted 30-year employee.

**DOW ANSWER:** Dow denies the allegations in Paragraph 59 of the Complaint.

**KREINBERG COMPLAINT**

60.    Defendants' malicious, false and defamatory statements have cast Kreinberg as a deceitful businessman who is without professional integrity, and have caused incalculable damage to Kreinberg's reputation and standing in the business community. Kreinberg has additionally suffered pecuniary loss, including his salary, benefits, and vested and unvested securities.

**DOW ANSWER:** Dow denies the allegations in Paragraph 60 of the Complaint.

**KREINBERG COMPLAINT**

61.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

**DOW ANSWER:** Dow incorporates its answers to Paragraphs 1-60 in its answer to Paragraph 61 of the Complaint.

**KREINBERG COMPLAINT**

62.    Liveris published, or caused to be published, false and derogatory statements regarding Kreinberg's profession, trade and business.

**DOW ANSWER:** Dow denies the allegations in Paragraph 62 of the Complaint.

**KREINBERG COMPLAINT**

63.    Liveris' defamatory statements were published to all parties who reviewed Dow's press releases and the news reports in which Liveris was quoted, including, but not limited to, Dow employees, members of the media and the public at large.

**DOW ANSWER:**  Dow admits that it published its press release on its website

and issued the release to the press.  Insofar as the allegations of Paragraph 63 refer to the

contents of documents, those documents speak for themselves.  Dow denies the remaining

allegations in Paragraph 63 of the Complaint.

**KREINBERG COMPLAINT**

64.    Liveris was aware that the publication of his false statements contained in Dow's press releases and internal memoranda would be widely reported in the international media and would cause damage to Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 64 of the Complaint.

**KREINBERG COMPLAINT**

65.    Liveris acted with malice and caused statements to be published that he knew to be false.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 65 of the Complaint.

**KREINBERG COMPLAINT**

66.    As a result of Liveris' defamatory statements, Kreinberg suffered, and continues to suffer, harm to his reputation and financial interests.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 66 of the Complaint.

**KREINBERG COMPLAINT**

67.    By reason of the foregoing, Liveris is liable for defamation per se, in an amount not less than $100 million.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 67 of the Complaint.

**KREINBERG COMPLAINT**

68.    Because of the willful, wanton and intentional nature of Defendant's conduct, Defendant is also liable for punitive damages in an amount to be determined at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 68 of the Complaint.

**KREINBERG COMPLAINT**

69.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

**DOW ANSWER:**  Dow incorporates its answers to Paragraphs 1-68 in its answer

to Paragraph 69 of the Complaint.

**KREINBERG COMPLAINT**

70.    Dow, through its corporate spokesman, senior executives and internet website, published, or caused to be published, false and derogatory statements regarding Kreinberg's profession, trade and business.

**DOW ANSWER:**  Dow admits that it published its press release on its website

and issued the release to the press.  Dow denies the remaining allegations in Paragraph 70 of the

Complaint.

**KREINBERG COMPLAINT**

71.    Dow's defamatory statements were published to all parties who reviewed Dow's press releases and the news reports in which Dow was quoted, including, but not limited to, Dow employees, members of the media and the public at large.

**DOW ANSWER:**  Dow admits that it published its press release on its website

and issued the release to the press.  Dow denies the remaining allegations in Paragraph 71 of the

Complaint.

**KREINBERG COMPLAINT**

72.    Dow was aware that its publication of the false statements contained in these press releases and news reports would be widely reported in the international media and would cause damage to Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 72 of the Complaint.

**KREINBERG COMPLAINT**

73.    Dow acted with malice, both presumed and actual, and published statements that it knew to be false.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 73 of the Complaint.

**KREINBERG COMPLAINT**

74.    As a result of Defendant's defamatory statements, Kreinberg suffered, and continues to suffer, harm to his reputation and financial interests.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 74 of the Complaint.

**KREINBERG COMPLAINT**

75.    By reason of the foregoing, Dow is liable for defamation per se, in an amount not less than $100 million.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 75 of the Complaint.

**KREINBERG COMPLAINT**

76.    Because of the willful, wanton and intentional nature of Defendant's conduct, Defendant is also liable for punitive damages in an amount to be determined at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 76 of the Complaint.

**KREINBERG COMPLAINT**

77.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

**DOW ANSWER:**  Dow incorporates its answers to Paragraphs 1-76 in its answer

to Paragraph 77 of the Complaint.

**KREINBERG COMPLAINT**

78.    Liveris published, or caused to be published, false and defamatory statements regarding Kreinberg and the basis for his termination.

**DOW ANSWER:** Dow denies the allegations in Paragraph 78 of the Complaint.

## KREINBERG COMPLAINT

79.    Liveris also falsely informed Kreinberg that he was terminated as a result of alleged disloyalty and a breach of his obligations and job duties to Dow.

**DOW ANSWER:** Dow admits that Kreinberg was told that the Company had concluded that he had violated his fundamental duties to Dow, including his fiduciary obligations to Dow and its shareholders. Dow denies the statement was false.

## KREINBERG COMPLAINT

80.    As a result of Liveris' defamatory statements, Kreinberg has been, and will continue to be, forced to defame himself, as he is required to repeat Liveris' false and derogatory allegations regarding his job performance to third parties.

**DOW ANSWER:** Dow denies the allegations in Paragraph 80 of the Complaint.

## KREINBERG COMPLAINT

81.    If asked to explain the circumstances of his termination, Kreinberg has no option but to inform third parties, including future potential employers, that he was accused of a serious ethical breach that resulted in his termination.

**DOW ANSWER:** Dow is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 81 of the Complaint, and therefore denies them.

## KREINBERG COMPLAINT

82.    Liveris knew, or should have known, that Kreinberg would be compelled to republish the defamatory statements.

**DOW ANSWER:** Dow denies the allegations in Paragraph 82 of the Complaint.

**KREINBERG COMPLAINT**

83.    Liveris intentionally manufactured false allegations against Kreinberg to further his personal goal of removing all challengers to his authority at Dow and out of personal animus towards Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 83 of the Complaint.

**KREINBERG COMPLAINT**

84.    As a result of Liveris' defamatory statements, Kreinberg has suffered, and continues to suffer, harm to his professional reputation and financial interests.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 84 of the Complaint.

**KREINBERG COMPLAINT**

85.    By reason of the foregoing, the [sic] Liveris is liable for defamation per se, compelled self-publication defamation, in an amount not less than $100 million, the exact amount to be proven at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 85 of the Complaint.

**KREINBERG COMPLAINT**

86.    Because of the willful, wanton and intentional nature of Liveris' conduct, Liveris is also liable for punitive damages in an amount to be determined at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 86 of the Complaint.

**KREINBERG COMPLAINT**

87.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

**DOW ANSWER:**  Dow incorporates its answers to Paragraphs 1-86 in its answer

to Paragraph 87 of the Complaint.

**KREINBERG COMPLAINT**

88.    Dow, its corporate spokesman and its employees published, or caused to be published, defamatory statements regarding Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 88 of the Complaint.

**KREINBERG COMPLAINT**

89.     Dow falsely informed Kreinberg that he was terminated as a result of alleged disloyalty and a breach of his obligations and job duties to Dow.  As a result, Kreinberg has been, and will continue to be, forced to defame himself, as he is required to repeat Defendants' false and derogatory allegations regarding his job performance to third parties.

**DOW ANSWER:**  Dow admits that Kreinberg was told that the Company had concluded that he had violated his fundamental duties to Dow, including his fiduciary obligations to Dow and its shareholders.  Dow denies the statement was false.  Dow denies the remaining allegations in Paragraph 89 of the Complaint.

**KREINBERG COMPLAINT**

90.     Dow knew, or should have known, that Kreinberg would be compelled to republish the defamatory statements.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 90 of the Complaint.

**KREINBERG COMPLAINT**

91.     As a result of Defendant's defamatory statements, Kreinberg has suffered, and continues to suffer, harm to his professional reputation and financial interests.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 91 of the Complaint.

**KREINBERG COMPLAINT**

92.     By reason of the foregoing, the Defendant is liable for defamation *per se*, compelled self-publication defamation, in an amount not less than $100 million, the exact amount to be proven at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 92 of the Complaint.

**KREINBERG COMPLAINT**

93.     Because of the willful, wanton and intentional nature of Defendant's conduct, Defendant is also liable for punitive damages in an amount to be determined at trial.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 93 of the Complaint.

**KREINBERG COMPLAINT**

94.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

**DOW ANSWER:**  Dow incorporates its answers to Paragraphs 1-93 in its answer to Paragraph 94 of the Complaint.

**KREINBERG COMPLAINT**

95.    Plaintiff maintained a contract relating to his pension with Dow Germany Ltd. & Co. OHG and/or Dow Deutschland GmbH & Co. OHG Betriebliche Versorgungsregelung.

**DOW ANSWER:**  Dow admits the allegations in Paragraph 95 of the Complaint.

**KREINBERG COMPLAINT**

96.    Defendants Dow and Liveris were aware of this contract.

**DOW ANSWER:**  Dow admits the allegations in Paragraph 96 of the Complaint.

**KREINBERG COMPLAINT**

97.    Dow and Liveris willfully, wantonly, recklessly and/or negligently induced the termination of this contract by misrepresenting and distorting information received from J.P. Morgan about Kreinberg and conveying these misrepresentations and distortions to others at Dow and the public at large.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 97 of the Complaint.

**KREINBERG COMPLAINT**

98.    Dow and Liveris also willfully, wantonly, recklessly and/or negligently induced the termination of this contract by publishing and/or causing to be published false and defamatory statements about Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 98 of the Complaint.

**KREINBERG COMPLAINT**

99.    Dow Germany Ltd & Co. OHG and/or Dow Deutschland GmbH & Co. OHG and/or Betriebliche Versorgungsregelung terminated this contract as a result of Defendants' conduct.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 99 of the Complaint.

**KREINBERG COMPLAINT**

100.    There exists no justification for Defendants' actions.

   **DOW ANSWER:**  Dow denies the allegations in Paragraph 100 of the

Complaint.

**KREINBERG COMPLAINT**

101.    But for Defendants' actions, Kreinberg's contract would not have been terminated.

   **DOW ANSWER:**  Dow denies the allegations in Paragraph 101 of the

Complaint.

**KREINBERG COMPLAINT**

102.    Because of Liveris' conduct, Kreinberg suffered both reputational loss and pecuniary loss in the form of income, vested and unvested securities and benefits.

   **DOW ANSWER:**  Dow denies the allegations in Paragraph 102 of the

Complaint.

**KREINBERG COMPLAINT**

103.    By reason of the foregoing, the [sic] Liveris is liable in an amount not less than $100 million.

   **DOW ANSWER:**  Dow denies the allegations in Paragraph 103 of the

Complaint.

**KREINBERG COMPLAINT**

104.    Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

   **DOW ANSWER:**  Dow incorporates its answers to Paragraphs 1-103 in its

answer to Paragraph 104 of the Complaint.

**KREINBERG COMPLAINT**

105.    Plaintiff and Dow maintained an ongoing business relationship for over thirty years.

**DOW ANSWER:**  Dow admits that Kreinberg and Dow maintained an ongoing employment relationship for over thirty years.

**KREINBERG COMPLAINT**

106.    Liveris was aware of this relationship, and maliciously, willfully, wantonly and with reckless disregard of Kreinberg's rights induced the termination of this ongoing relationship by misrepresenting and distorting information received from J.P. Morgan about Kreinberg and conveying these misrepresentations and distortions to others at Dow and the public at large.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 106 of the Complaint.

**KREINBERG COMPLAINT**

107.    Liveris also maliciously, willfully, wantonly and in reckless disregard of Kreinberg's rights induced the termination of this ongoing relationship by publishing or causing to be published false and defamatory statements about Kreinberg.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 107 of the Complaint.

**KREINBERG COMPLAINT**

108.    There exists no justification for Liveris' actions, which were undertaken outside the scope of his employment, and for his own personal and professional gratification and benefit.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 108 of the Complaint.

**KREINBERG COMPLAINT**

109.    But for Liveris' actions, Kreinberg would continue to be employed with Dow today.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 109 of the

Complaint.

## KREINBERG COMPLAINT

110.    Because of Liveris' conduct, Kreinberg suffered both reputational loss and pecuniary loss in the form of income, vested and unvested securities and benefits.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 110 of the

Complaint.

## KREINBERG COMPLAINT

111.    By reason of the foregoing, the [sic] Liveris is liable in an amount not less than $100 million.

**DOW ANSWER:**  Dow denies the allegations in Paragraph 111 of the

Complaint.

## THE DOW CHEMICAL COMPANY'S AFFIRMATIVE DEFENSES

Dow sets forth the following affirmative defenses:

### First Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Kreinberg is estopped by his own actions from pursuing the claims set forth in the Complaint.

### Third Defense

Some or all of Kreinberg's claims are barred by the doctrines of waiver.

### Fourth Defense

Kreinberg has failed to plead special damages with particularity as required by the Federal Rules of Civil Procedure.

### Fifth Defense

Kreinberg's libel claim is barred (in whole or in part) because the statements alleged in the Complaint are not defamatory.

### Sixth Defense

Kreinberg's libel claim is barred (in whole or in part) because the statements alleged in the Complaint are true or substantially accurate.

### Seventh Defense

Kreinberg's libel claim is barred (in whole or in part) because the statements alleged in the Complaint are non-actionable statements of opinion.

## Eighth Defense

Kreinberg's libel claim is barred (in whole or in part) because the statements alleged in the Complaint were not made with actual malice.

## Ninth Defense

Kreinberg's libel claim is barred (in whole or in part) because the statements alleged in the Complaint are subject to one or more qualified privileges under applicable law.

## Tenth Defense

Kreinberg's libel claim is barred (in whole or in part) because the Complaint fails to plead actual malice with the requisite specificity.

## Eleventh Defense

Kreinberg's libel claim is barred (in whole or in part) by the incremental harm doctrine.

## Twelfth  Defense

Kreinberg's libel claim is barred (in whole or in part) by the single instance rule.

## Thirteenth Defense

Kreinberg is not entitled to punitive damages under applicable law.

## Fourteenth Defense

Kreinberg's injuries and damages (if any) were caused by the acts of Kreinberg and his representatives, for which Dow is not responsible.

## Fifteenth Defense

Dow's actions described in the Complaint are protected by the First Amendment to the United States Constitution.

### Sixteenth Defense

Dow's performance obligations under any contracts with Kreinberg were and are excused due to Kreinberg's prior material breach of those agreements.

### Seventeenth Defense

Kreinberg's injuries and damages (if any) were caused by acts or omissions of parties over whom Dow had no control and for whom Dow is not legally responsible.

### Eighteenth Defense

Dow reserves the right to plead such additional defenses as may be appropriate depending upon facts later revealed during discovery.

**WHEREFORE**, Dow denies that it is liable to Kreinberg, prays for judgment in its favor, asks the Court to dismiss Kreinberg's Complaint with prejudice, and asks the Court to award Dow its reasonable attorneys' fees and legal costs incurred in this action and such other and further relief as this Court deems appropriate.

## COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure 13, The Dow Chemical Company ("Dow") asserts its Counterclaim against Romeo Kreinberg ("Kreinberg") as follows:

## THE PARTIES

1.      Plaintiff The Dow Chemical Company has its principal place of business in Midland, Michigan, where for over a century its headquarters has been located. Dow is a leader in science and technology, providing innovative chemical, plastic and agricultural products and services to many essential consumer markets. Dow, including its consolidated subsidiaries, had annual sales of $49 billion in 2006 and employs approximately 43,000 people worldwide. The company is a Delaware corporation and is publicly-traded on the New York Stock Exchange.

2.      Defendant Romeo Kreinberg is an individual residing in Key Biscayne, Florida. Kreinberg is a citizen and a domiciliary of Florida. At the time of his termination from Dow, Kreinberg was Dow's executive vice president for the Performance Plastics & Chemicals Portfolio.

## JURISDICTION

3.      This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1332.

4.      There is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court therefore has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## FACTUAL SUMMARY

**DOW HIRES KREINBERG, WHO RISES TO EXECUTIVE VICE PRESIDENT.**

5.      Defendant Kreinberg joined Dow in 1977 and also rose to become one of Dow's most senior and trusted executives.  Kreinberg held a series of sales, marketing, business operations and commercial management positions in Europe until 1992, when he was named general manager for Dow Italy and vice president of Dow Europe.  He subsequently held global vice president and business group president positions until he became senior vice president for plastics at Dow in 2003.  In 2004, he became a member of Dow's Office of the Chief Executive. After serving as Dow's senior vice president of Plastics, on September 15, 2005 Kreinberg was named executive vice president for the Performance Plastics & Chemicals Portfolio.  Kreinberg was also a member of Dow's Executive Leadership Committee, which is tasked with defining Dow's strategic direction.

6.      As a senior executive at Dow, Kreinberg was intimately involved in Dow's most important strategic decisions and had access to Dow's most sensitive, proprietary, and confidential information.  As a result of his various positions, Kreinberg owed Dow various fiduciary duties, including fiduciary duties of candor and undivided loyalty.

**DOW EMBARKS ON NEW STRATEGIC INITIATIVE.**

7.      The operative events in this lawsuit find a critical point in July 2006.  That month Dow held a weeklong retreat for its board and senior management.  The express aims of that retreat were (i) to educate new directors about the ins and outs of serving as a board member and (ii) to discuss corporate strategy.  Kreinberg attended this meeting.

8.      During this meeting, Dow's leadership heard formal presentations reviewing a proposal that Dow pursue a new strategy to extract more value from Dow's cyclical commodities business and direct some of the resulting funds into the company's lucrative specialty-products business.

9.      This July 2006 meeting culminated with the Board adopting a significant strategy to focus on Dow's higher-profit, specialty products.  Dow would focus its global resources and formidable research and development on tackling pressing global issues with high-performance products.

10.      Specifically, Kreinberg played a key role in executing this plan.  He served as a senior executive in the critical specialty-products business.  He was a leader in the new focus on these markets.  Kreinberg had access to all manner of detailed plans for these products, operations, and overall business.

11.      Armed with this knowledge of Dow's innermost secrets and latest plans, Kreinberg would launch on a course of deception and betrayal.

**FOLLOWING DOW'S NEW STRATEGIC INITIATIVE, THERE ARE REPEATED PRESS REPORTS OF MAJOR PROPOSED TRANSACTIONS INVOLVING DOW, WHICH CLOUDED DOW'S FUTURE AND ROILED ITS MANAGEMENT AND EMPLOYEES.**

12.      Soon after Dow began to pursue its new strategic initiative, repeated press reports began to surface that Dow was going to be involved in a major proposed transaction.  These press reports clouded Dow's future, distracted Dow from its business objectives, and roiled its management and employees.  Accordingly, Dow began an effort to assuage these negative effects on Dow's business, determine the source of these rumors, and assess their validity.

13.    The first press coverage was in January 2007.  Specifically, on the morning of January 18, 2007, the *Financial Times* ran a story in which it was reported that "talk in the market was that a consortium of private equity groups was working on a break-up bid for Dow Chemical."

14.    The rumors in the January 18, 2007 *Financial Times* story were disruptive and a matter of great concern to Dow.  Accordingly, Dow began an inquiry to determine:  (i) whether there was a basis for these rumors; and (ii) the source of these rumors.  As part of this inquiry, Dow pursued information from the investment banking and financial community regarding potential bids for some or all of Dow.  Although Kreinberg was aware of this inquiry and its importance to Dow, he did not inform Dow about any knowledge he had regarding these rumored transactions involving Dow.

15.    Dow's Board of Directors discussed the January 18, 2007 *Financial Times* rumors at its February 14, 2007 board meeting.  Although Kreinberg was aware of that meeting, he did not tell the board members that he had any knowledge about potential major transactions involving Dow.

16.    On the morning of February 25, 2007, the *Sunday Express* reported that Dow was "set to become the target of the world's largest-ever leveraged buyout," with three private equity firms ready to bid $54 billion for Dow.

17.    As with the January 18, 2007 *Financial Times* rumors, the rumors in the February 25, 2007 *Sunday Express* story were again disruptive and a matter of great concern to Dow.  Accordingly, Dow vigorously continued its inquiries, including its inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.  Although Kreinberg was aware of these inquiries

36

and their importance to Dow, again Kreinberg did not inform Dow about any knowledge he had about potential major transactions involving Dow.

18.     On March 12, 2007, the *Evening Standard* ran a story naming a banker as the "mastermind" of a $60 billion leveraged buyout of Dow, which would be "the largest buyout the world has ever seen."

19.     As with the January 18, 2007 *Financial Times* rumors and the February 25, 2007 *Sunday Express* rumors, the rumors in the March 12, 2007 *Evening Standard* story were again damaging and a matter of great concern to Dow.  Accordingly, Dow continued its quest to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.  Although Kreinberg was aware of these inquiries and their importance to Dow, again Kreinberg did not inform Dow about any knowledge he had about discussions among certain third-parties regarding potential transactions involving Dow.

20.     On March 15, 2007 — the day before the March 16 meeting of Dow's Board of Directors — Kreinberg responded to an email sent to him by an employee who reported to him.  The employee's email forwarded Kreinberg the portion of the *Evening Standard* story describing the possible $60 billion takeover of Dow.  Kreinberg authored this response: "E se non e vero, e ben trovato.  Which means in italian, if its not true its well invented."

## IT IS FINALLY REVEALED — BY SOURCES OTHER THAN KREINBERG — THAT KREINBERG WAS MEETING WITH INVESTMENT BANKERS REGARDING POTENTIAL MAJOR TRANSACTIONS INVOLVING DOW.

21.     The events that unfolded after the March 16 meeting of Dow's Board of Directors culminated in the identification of Kreinberg as a person who had played a role in discussions about potential major transactions involving Dow.

22.    On April 8, 2007, the *Sunday Express* trumpeted that a buyout of Dow "could be days away, as a consortium of Middle Eastern investors and American buyout firms puts the finishing touches to an approach for U.S. giant Dow Chemical."

23.    As with the previous rumors regarding potentially huge transactions involving Dow, the rumors in the April 8, 2007 *Sunday Express* story were disruptive and a matter of great concern to Dow.    Accordingly, Dow continued its inquiries, including inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.    Although Kreinberg was aware of these inquiries and their importance to Dow, Kreinberg did not inform Dow that he had any knowledge about discussions among third-parties regarding potential major transactions involving Dow.

24.    Within 48 hours of the *Sunday Express* story, information regarding potential transactions involving Dow that wasn't revealed by Kreinberg was shared with Dow by a major international financial institution (the "Bank").

25.    On April 9, 2007, Dow issued a press release stating:  "The Company has had no discussions about a leveraged buyout."    The press release did not cause Kreinberg to come forward or otherwise divulge the role he had played.

26.    That same day, the Bank's CEO and another senior banker traveled to Midland, Michigan to have a previously-scheduled dinner with two senior executives from Dow, including Dow's CEO.    That evening, the Bank's CEO explained that the Bank's London affiliate had been working on behalf of certain Middle Eastern investors on potential major transactions involving Dow.    The Bank's CEO subsequently explained that a variety of potential transactions were being discussed, including a purchase of Dow in its entirety.    He also revealed that people close

to Dow were involved in the discussions, and he committed to identifying who those persons were.

27.    On April 10, 2007, a day after their dinner, the Bank's CEO called Dow's CEO and identified Kreinberg and J. Pedro Reinhard as the Dow employees involved in the discussions with third-parties about a major transaction involving Dow.  He also told Dow's CEO that these two Dow employees had discussions with representatives of the Bank's London affiliate.

**DOW'S BOARD OF DIRECTORS ACTS DELIBERATELY AND PROMPTLY TO TERMINATE KREINBERG'S EMPLOYMENT.**

28.    Accordingly, three months after the extraordinarily distracting rumors about Dow first surfaced, Dow finally learned that two of its most trusted senior executives, including Kreinberg, had not disclosed their personal involvement in unauthorized discussions with third-parties at the center of the rumored transactions.  This startling realization was worsened by the fact that Dow did not learn of the senior executives' involvement from the senior executives themselves, but rather from a third party source.

29.    Early on April 11, 2007, Dow's CEO informed Dow's Presiding Director and the Chair of Dow's Audit Committee of the information that he had learned from the Bank's CEO. Dow's Board of Directors had a regularly scheduled meeting on April 11, and Dow's CEO, as Chairman, made this the first item of business for the meeting at 3:45 p.m.  Dow's CEO presented to the Board the information he had, and then asked for the Board's thoughts as to how he should proceed.  The Board discussed the situation at length and asked many questions about the activities of Reinhard and Kreinberg and the credibility of the information provided to Dow's CEO by the Bank's CEO.  There was unanimous agreement among the directors that the information was credible, and that the two employees should be terminated.

30.     However, the Board asked Dow's CEO to meet with each employee, present the newly-uncovered information, and ask for their explanation.  Those meetings were arranged for 7:00 a.m. on April 12, 2007.  The Board asked the following individuals to join Dow's CEO at the meetings:  Charles Kalil, Paul Stern, and Arnold Allemang (a member of the Board).  Martin Lipton, outside counsel for Dow, also attended.

31.     On April 12, 2007, the group identified above met with Kreinberg, beginning at 7:00 a.m.  Kreinberg denied the allegations without offering any sort of explanation.

32.     Given the aforementioned denials, and following those meetings, Dow's CEO and its outside counsel placed calls to the Bank's CEO and the Bank's general counsel.  The Bank's CEO reconfirmed the information that he had previously provided to Dow's CEO.

33.     The Executive Committee of Dow's Board met the morning of April 12, 2007 and the other Directors were invited to attend.  Dow's CEO informed the Committee of the meetings with Kreinberg, the fact that his employment was terminated, as well as the follow-up calls to the Bank's CEO and general counsel.  The Committee then voted to remove Kreinberg as a Dow officer.

34.     As a result of serious misconduct and conduct harmful to the interest of the Company, including breaches of fiduciary duty and breaches of the express terms of contracts with Dow, Dow terminated the employment of Kreinberg.

**KREINBERG HAS PLAINLY BREACHED HIS COMPENSATION AGREEMENTS WITH DOW.**

35.     Dow acted promptly to terminate Kreinberg's employment due to his repeated and serious misconduct that served to advance his own agenda at the expense of Dow.  As described in more detail below, Kreinberg's actions and the consequent termination of his employment by Dow has serious effects on his past and present compensation arrangement,

including the cancellation of certain outstanding equity awards and the obligation of Kreinberg to repay certain amounts previously realized in respect of certain equity awards.

36.    Kreinberg has received significant equity-based awards under, among other plans, The Dow Chemical Company 1988 Award and Option Plan (the "1988 Plan").  Kreinberg has received the following relevant equity awards under the 1988 Plan: (i) awards of stock options ("Stock Options"), (ii) awards of performance shares (including certain performance deferred shares) ("Performance Awards") and (iii) awards of deferred stock (including certain other performance deferred shares) ("Deferred Stock Awards").  In addition, Kreinberg receives dividend unit awards ("Dividend Units") under The Dow Chemical Company Dividend Unit Plan (the "Dividend Unit Plan").  These four types of awards are referred to as the "Equity Awards."  Immediately prior to the termination of his employment, Kreinberg had outstanding Equity Awards with an estimated value of $15,000,000 and, in the three years prior to his termination, Kreinberg had recognized approximately $5,000,000 in value from his Equity Awards.  These awards were made by Dow to, among other things, encourage and reward loyal service to Dow.

### A.    Equity Awards Issued Under the 1988 Plan

37.    The 1988 Plan is administered by Dow's Compensation Committee.  Section 4.02 of the 1988 Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the [Compensation] Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the [Compensation] Committee, shall be final, binding and conclusive on the Company, . . . all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

38.     Each Equity Award made to Kreinberg under the 1988 Plan is subject to the terms and conditions of the 1988 Plan itself and an award agreement that sets out certain very specific conditions that apply to such awards.  Although the terms and conditions applicable to each such Equity Award vary somewhat in detail, and with one exception not here relevant, each Equity Award issued to Kreinberg under the 1988 Plan that is relevant to this claim provides that (i) the Equity Award is immediately canceled and forfeited if the holder's employment with Dow and its affiliated companies is terminated for any reason other than death, disability or retirement, (ii) each Equity Award that has not previously been terminated is canceled and forfeited if the holder engages in certain activities determined to be harmful or adverse to Dow or its affiliates and (iii) if the holder engages in certain activities determined to be harmful or adverse to Dow or its affiliates, the holder may be required to repay any value the holder received in respect of any Equity Award during the three-year period preceding such activities.

39.     By way of example, Section 2 of certain agreements covering Stock Options granted to Kreinberg provides that "[e]xcept in the case of death, disability or retirement, this Agreement shall terminate as soon as you are no longer employed by the Company or any Subsidiary or Affiliate (collectively, a "Dow Company"), notwithstanding the fact that the stated term of this Agreement may not have expired."  Section 7 of these Stock Option agreements provide that "[i]f you engage . . . in any activity harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . then any Option under this Agreement shall terminate effective on the date on which you enter into such activity. . . . The Compensation Committee shall, in its sole discretion, determine whether the above conditions have been met, and the determination of the Compensation Committee shall be final and binding as to all

parties." Section 6 of these Stock Option agreements further provide that "[i]f at any time within three years after you exercise any portion of this Option you engage in any activity, . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . any [option spread realized] on the date of exercise shall be paid by you to the Company."

40.    In the same vein, Section 6 of certain agreements covering Performance Awards granted to Kreinberg provides that "[e]xcept in the case of retirement, disability or death, this Agreement shall terminate upon your voluntary or involuntary termination of a Dow Company. Participation shall be automatically terminated and all rights under this Agreement forfeited by you if the Compensation Committee, in its sole judgment, determines that you have at any time during the term of this Agreement engaged in any activity harmful to the interests of or in competition with a Dow Company." Section 8 of these Performance Award agreements further provide that "[i]f at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company."

41.    Section 4 of certain agreements covering Deferred Stock Award granted to Kreinberg similarly provides that "[t]his Agreement shall terminate and your rights under this Agreement shall be forfeited if you employment with any Dow Company is terminated for any reason other than death, disability or retirement." Section 8 of these Deferred Stock Award agreements further provide that "[i]f you at any time during the term of this Agreement you engage in any act of Unfair Competition (as defined below), this Agreement shall terminate

43

effective on the date on which you enter into such act of Unfair Competition . . . In addition, if at any time within three years after issuance and delivery of this Deferred Stock you engage in any act of Unfair Competition, you shall promptly pay to the Company the [value previously received pursuant to the Deferred Stock Award].  The Compensation Committee shall, in its sole discretion, determine when any act of Unfair Competition has occurred, and the determination of the Compensation Committee shall be final and binding as to all parties.  For purposes of this Agreement, the term 'Unfair Competition' shall mean and include activity on your part that . . . is or may be harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought . . . ."

### B.    Equity Awards Issued Under the Dividend Unit Plan

42.    The Dividend Unit Plan is also administered by the Compensation Committee. Section 4.02 of the Dividend Unit Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the Compensation Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the Compensation Committee, shall be final, binding and conclusive on the Company, . . . all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

43.    Each Equity Award made to Kreinberg under the Dividend Unit Plan is subject to the terms and conditions of the Dividend Unit Plan.  The Dividend Unit Plan provides that Dividend Units may be forfeited "if the Awardee terminates his or her employment with the Company or its Subsidiaries for any reason other than death or retirement . . . Dividend Units may further be forfeited by an Awardee if the Committee determines that the Awardee has at any

time engaged in any activity harmful to the interest of or in competition with the Company or its Subsidiaries or accepts employment with a competitor."

### C. Termination of Kreinberg and the Effect on His Equity Awards

44.    At a meeting duly convened on April 12, 2007, the Compensation Committee discussed the termination of Kreinberg and determined that he had engaged in serious misconduct and conduct harmful to the interests of Dow.  The Compensation Committee then authorized certain employees of Dow to take any and all action on behalf of Dow as may be necessary and sufficient to freeze, terminate and/or "claw-back" any and all remuneration and benefits of Kreinberg.  At this meeting, the Compensation Committee did not conclude that Kreinberg had retired from Dow for purposes of any of his Equity Awards.

45.    As a result of Dow's prompt and proper action in terminating Kreinberg for the actions described herein, Dow (i) is entitled to be repaid certain amounts realized by Kreinberg in connection with Equity Awards previously granted to him under the 1988 Plan and (ii) has no further obligations to Kreinberg under any Equity Awards outstanding at the time of his termination of employment.  Dow now brings this counterclaim to recover these amounts.

### D. Kreinberg Forfeits Other Benefits by Breaching His Duty of Loyalty

46.    On April 12, 2007, Dow terminated the employment of Kreinberg as a consequence of his serious misconduct that was harmful to the interest of the company.  Dow, which is plan administrator of The Dow Chemical Company Medical Care Program ("Medical Plan"), determined that the Kreinberg is not entitled to "COBRA" health continuation coverage under the Medical Plan pursuant to ERISA's "gross misconduct" exception (ERISA § 603(2)) to COBRA coverage.  Furthermore, upon the end of his employment, pursuant to Section 606 of

ERISA, 29 U.S.C. § 1166, Dow, as plan administrator of the Medical Plan, would have ordinarily provided Kreinberg notice of his COBRA rights (*i.e.*, rights to temporary continuation of health benefits) through its third-party administrator. Due to Kreinberg's gross misconduct, however, Dow, as plan administrator, is not required by ERISA to notify Kreinberg of his COBRA rights, and therefore has not provided Kreinberg with notice of his COBRA rights.

## COUNT I

### (BREACH OF FIDUCIARY DUTY)

47.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 46, inclusive.

48.    Kreinberg, by virtue of his position as a senior executive and officer of Dow, owed Dow various fiduciary duties, including the fiduciary duties of loyalty and candor.

49.    Kreinberg breached his fiduciary duties to Dow by, among other things, engaging in secret and unauthorized discussions for his own benefit with third-parties regarding proposed transactions involving Dow, and by failing to disclose those discussions even while Dow was searching to determine the validity and source of rumors that Dow was about to be hostilely acquired by a third party. These rumors were doing great damage to Dow and were highly disruptive.

50.    As a result of Kreinberg's breaches of fiduciary duty, Dow has been damaged in an amount to be proven at trial.

## COUNT II

### (BREACH OF CONTRACT)

51.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 50, inclusive.

52.     Dow and Kreinberg are parties to agreements covering Equity Awards issued under the 1988 Plan.

53.     The agreements covering each Deferred Stock Award, Stock Option, and Performance Award, are valid, binding, and enforceable contracts between Dow and Kreinberg.

54.     Each of the agreements covering each Deferred Stock Award provides that Kreinberg is required to repay amounts realized in respect of the Deferred Stock Award within three years of the date Kreinberg engages in activity harmful to the interests of Dow or its affiliates.   As an illustrative example, paragraph 8 of a Deferred Stock Award agreement to which the Plaintiff is a party provides:

> If at anytime within three years after issuance and delivery of this Deferred Stock you engage in any act of Unfair Competition, you **shall promptly pay** to the Company the Fair Market Value of Shares Earned and Dividends Equivalents paid.  The Compensation Committee shall, in its sole discretion, determine when any act of Unfair Competition has occurred, and the determination of the Compensation Committee shall be **final and binding** as to all parties.  For purposes of this Agreement, the term "Unfair Competition" shall mean and include activity on your part that . . . is or may be harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought . . .

(*emphasis added*)

55.     On April 12, 2007, Dow's Compensation Committee determined that Kreinberg had engaged in serious misconduct and conduct harmful to the interests of Dow and authorized certain officers of Dow to take all actions necessary and sufficient to "claw-back" any and all remuneration and benefits, in whatever form, of Kreinberg.

56.     Despite this finding by Dow's Compensation Committee, which is "final and binding as to all parties," Kreinberg has breached its obligation to pay promptly to Dow "the Fair Market Value of Shares Earned and Dividends Equivalents paid" under the agreements covering each Deferred Stock Award.

57.    Each of the agreements covering each Stock Option provides that Kreinberg is required to repay amounts realized in respect of the Stock Option within three years of the date Kreinberg engages in activity harmful to the interests of Dow or its affiliates.  As an illustrative example, paragraph 6 of a Stock Option agreement to which Kreinberg is a party provides:

> If at any time within three years after you exercise any portion of this Option you engage in any activity . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . any [option spread realized] on the date of exercise shall be paid by you to the Company.

58.    Despite Dow's Compensation Committee's finding on April 12, 2007, that Kreinberg had engaged in misconduct, Kreinberg has breached his obligation to pay promptly to Dow the option spread realized under the agreements covering each Stock Option.

59.    Each of the agreements covering each Performance Award provides that the Kreinberg is required to repay amounts realized in respect of the Performance Award if, within three years of the end of the applicable performance period, Kreinberg engages in activity harmful to the interests of Dow or its affiliates.  As an illustrative example, paragraph 8 of a Performance Award agreement to which Kreinberg is a party provides:

> If at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company.

60.    Despite Dow's Compensation Committee's finding on April 12, 2007, that Kreinberg had engaged in misconduct, Kreinberg has breached his obligation to pay promptly to Dow the value previously received pursuant to the Performance Award under the agreements covering each Performance Award.

61.    As a result of Kreinberg's breaches of contract, Dow has suffered damages in an amount to be proven at trial.

## COUNT III

## (DECLARATORY JUDGMENT)

62.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 61, inclusive.

63.    Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

64.    Specifically, Dow is entitled to a declaratory judgment that Kreinberg is obligated to:

(a)    Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates.

(b)    Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates.

(c)    Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates.

65.    There is an actual controversy within the jurisdiction of this Court between Dow and Kreinberg with respect to Kreinberg's obligation to repay certain amounts of the Equity Awards in that Kreinberg has denied engaging in harmful conduct that would trigger his repayment obligations.

66.    Resolution of this controversy requires a declaration by this Court of the Kreinberg 's repayment obligations with respect to his Equity Awards.

**COUNT IV**

**(DECLARATORY JUDGMENT)**

67.     Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 66, inclusive.

68.     Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

69.     Dow respectfully requests that this Court declare that Dow has no further obligation to Kreinberg in respect of his Equity Awards, whether issued pursuant to the 1988 Plan or the Dividend Unit Plan.  As set forth above, each of the Equity Awards were to be terminated and forfeited upon the termination of Kreinberg's employment for any reason other than death or, in most cases, disability or retirement.  Because the Compensation Committee did not determine that Kreinberg "retired" for purposes of these Equity Awards, these Equity Awards are no longer in force or effect.

70.     Moreover, each Equity Award provides that it is to be terminated and forfeited if Kreinberg engaged in activities harmful to Dow or certain of its affiliates.  The Compensation Committee specifically determined that Kreinberg engaged in serious misconduct and conduct harmful to the interests of Dow.  Accordingly, each of the Equity Awards is no longer in force or effect.

71.     There is an actual controversy within the jurisdiction of this Court between Dow and Kreinberg with respect to his rights to the Equity Awards in that the Kreinberg has denied engaging in harmful conduct that would terminate his rights to the Equity Awards.

## COUNT V

## (DECLARATORY JUDGMENT)

72.     Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 71, inclusive.

73.     Pursuant to 28 U.S.C. § 2201, Dow seeks a judicial determination and declaration of its contractual rights and its legal rights under ERISA.

74.     Dow respectfully requests that this Court declare that:

(a)     Due to Kreinberg's gross misconduct, Dow is not required by ERISA to notify Kreinberg of his COBRA rights.

75.     There is an actual controversy within the jurisdiction of this Court between Dow and Kreinberg's with respect to Kreinberg's rights to notice of his COBRA health continuation coverage in that Kreinberg has denied his gross misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Dow respectfully requests that this Honorable Court hold a jury trial and:

(a)     Enter judgment for Dow on all of its claims; and

(b)     Award Dow all amounts that it is entitled to as a result of Kreinberg's breaches of fiduciary duty, together with interest, costs, attorney's fees, punitive damages, and such other relief as may be just and equitable.

(c)    Award Dow all amounts that it is entitled to as a result of Kreinberg's breaches of contract, together with interest, costs, attorney's fees, and such other relief as may be just and equitable.

(d)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Kreinberg is obligated to:

    (i)    Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates;

    (ii)    Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates;

    (iii)    Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Kreinberg engaged in misconduct harmful to Dow and/or its affiliates; and

(e)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Dow has no further obligation to Kreinberg with respect to his Equity Awards;

(f)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that:

    (i)    Due to Kreinberg's gross misconduct, Dow is not required by ERISA to notify Kreinberg of his respective COBRA rights; and

(g)    Award Dow such other relief as may be just and equitable.

Dated: June 20, 2007                    Respectfully submitted,

                                        _____s/_____
                                        David M. Bernick, P.C.
                                        Peter Duffy Doyle (PD 1735)
                                        KIRKLAND & ELLIS LLP
                                        Citigroup Center
                                        153 East 53rd Street
                                        New York, NY  10022-4611
                                        Telephone:  (212) 446-4800
                                        Facsimile:   (212) 446-4900

                                        Attorneys for Defendant and Counterclaimant
                                        THE DOW CHEMICAL COMPANY