UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

ROMEO KREINBERG,

                          Plaintiff,

    - against -

THE DOW CHEMICAL COMPANY and ANDREW N.
LIVERIS,

                       Defendants.

------------------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

07 CIV 4557 (VM)
(ECF)


## ROMEO KREINBERG'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE DOW CHEMICAL COMPANY'S COUNTERCLAIMS


ARKIN KAPLAN RICE LLP
590 Madison Avenue
35th Floor
New York, New York 10022

*Attorneys for Plaintiff/Counterclaim
Defendant Romeo Kreinberg*

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

FACTS ......................................................................................................................... 3

    A.     Rumors of a Hostile Bid and Dow's Response............................................ 3

    B.     Dow's Andrew Liveris Meets with the Bank's CEO ............................................. 5

    C.     Kreinberg's Termination ................................................................................. 7

    D.     Dow's Injury ................................................................................................... 7

    E.     Dow's Claims................................................................................................... 7

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT .............................................................................................................. 8

I.      DOW FAILS TO PLEAD A BREACH OF FIDUCIARY DUTY.................................... 8

    A.     Dow Fails To Set Forth Facts Giving Rise To A Legal Duty to Disclose............. 9

    B.     Even Assuming A Legal Duty To Disclose Exists, Dow Fails To Set Forth Facts Identifying A Breach Of This Legal Duty.................................................... 13

    C.     Dow Fails to Allege Causation. ........................................................................ 15

II.     DOW'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED. ................... 15

III.    DOW'S DECLARATORY JUDGMENT CLAIMS ARE CONTRARY TO THE DJA. ................................................................................................................. 17

    A.     Counts III And IV Of The Counterclaims Are Duplicative To Dow's Contract Claim And Should Be Dismissed............................................................. 18

    B.     Count V of the Counterclaims Should Be Dismissed. ......................................... 19

CONCLUSION............................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aetna Cas. & Sur. Co. v. Sunshine Corp.,*
   74 F.3d 685 (6th Cir 1996) ........................................................................................ 23

*Aetna Life Ins. Co. v. Haworth,*
   300 U.S. 227 (1937)............................................................................................. 23, 24

*Aslanukov v. American Express Travel Related Services Co., Inc.,*
   426 F. Supp. 2d 888 (W.D.Wis. 2006) .................................................................... 22

*Bank v.* Dale,
   386 F.3d 763 (6th Cir. 2004) ................................................................................. 25

*Bell Atlantic Corp. v. Twombly,*
   127 S.Ct. 1955 (2007)............................................................................................... 9

*Benihana of Tokyo, Inc. v. Benihana, Inc.,*
   891 A.2d 150 (Del Ch. 2005)................................................................................... 12

*Chiarella v. U.S.,*
   445 U.S. 222 (1980)................................................................................................ 10

*Ciro, Inc. v. Gold,*
   816 F. Supp. 253 (D. Del. 1993)............................................................................. 11

*Conley v. Gibson,*
   355 U.S. 41 (1957).................................................................................................. 20

*Cortec Indus., Inc. v. Sum Holding, L.P.,*
   949 F.2d 42 (2d Cir. 1991)........................................................................................ 4

*Dow Jones & Co., Inc. v. Harrods Ltd.,*
   346 F.3d 357 (2d Cir. 2003)..................................................................................... 21

*First Nat'l City v. Banco Para el Comercio Exterior de Cuba,*
   462 U.S. 611 (1983)................................................................................................ 11

*Florists' Transworld Delivery, Inc. v. FleuropInterflora,*
   261 F. Supp. 2d 837 (E.D. Mich. 2003).................................................................. 22

*Frantz Mfg. Co. v. EAC Indus.,*
   501 A.2d 401 (Del. 1985) ....................................................................................... 17

*Glidden Co. v. Jandernoa,*
　　173 F.R.D. 459, 471 (W.D. Mich. 1997) .................................................................................... 11

*Hart v. General Motors Corp,*
　　129 A.D. 2d 179 (1st Dept. 1987) ............................................................................................... 11

*In re J.P. Morgan Chase & Co. Derivative Litig.,*
　　906 A.2d 766 (Del. 2006) ........................................................................................................... 18

*In re MONY Group Inc. Shareholder Litig.,*
　　852 A.2d 9, 30-31 (Del. Ch. 2004) ............................................................................................ 15

*Kougl v. Xspedius Mgmt. Co.,*
　　No. CIV.A. 3:04 CV 2518-D, 2005 WL 1421446 N.D. Tex. June 1, 2005 .............................. 22

*Krim v. Pronet, Inc.,*
　　744 A.2d 523 (Del. Ch. 1999) .................................................................................................... 15

*Loudon v. Archer-Daniels-Midland Company,*
　　700 A.2d 135 (Del. 1977) .......................................................................................................... 16

*Maryland Cas. Co. v. Pacific Coal & Oil. Co.,*
　　312 U.S. 270 (1941) .................................................................................................................... 24

*Maryland Casualty Co. v. W.R. Grace & Co.,*
　　88 CIV 2613, 1996 WL 109068 (S.D.N.Y. Mar. 12, 1996) ...................................................... 24

*Metro Communication Corp. BVI v. Advanced Mobilecom Technologies Inc.,*
　　854 A.2d 121, 155 (Del. Ch. 2004) ........................................................................................... 11

*Minard v. Iazzetti,* No. CIV. A. 06-645 (MLC);
　　2007 WL 1462402 (D.N.J. May 15, 2007) ................................................................................ 13

*Next G Network of New York, Inc. v. City of New York,*
　　03 CIV 9672, 2006 WL 538189 (S.D.N.Y. Mar. 6, 2006) ....................................................... 22

*O'Reilly v. Transworld Healthcare, Inc.,*
　　745 A.2d 902 (Del. Ch. 1999) .................................................................................................... 18

*Orman v. Cullman,*
　　794 A.2d 5, 22 (Del. Ch. 2002) .................................................................................................. 12

*Pakideh v. Ahadi,*
　　99 F. Supp. 2d 805 (E.D. Mich. 2000) ...................................................................................... 23

*Public Serv. Comm'n v. Wycoff Co.,*
　　344 U.S. 237 (1952) .................................................................................................................... 20

*Rogers v. Baxter Intern., Inc.,*
    417 F. Supp. 2d 974, 984 (N.D. Ill. 2006) ................................................................. 10

*Scarabello v. Reichle,*
    No. 93 C 4606, 1995 WL 153338 (N.D. Ill. Apr. 6, 1995) ....................................... 14

*Seibert v. Sperry Rand Corp.,*
    586 F.2d 949 (2d Cir. 1978)..................................................................................... 14

*Shamrock Holdings, Inc. v. Polaroid Corp.,*
    559 A.2d 257 (Del. Ch. 1989).................................................................................. 15

*Solo Cup Co. v. Fed. Ins. Co.,*
    619 F.2d 1178, 1189 (7th Cir. 1980) ........................................................................ 23

*Solomon v. Armstrong,*
    747 A.2d 1098, 1131 (Del. Ch. 1999)....................................................................... 13

*The Dow Chemical Company v. J. Pedro Reinhard, et al.,*
    07-CV-12012 (TLL) (E.D. Mich. filed May 8, 2007) ................................................. 2

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
    840 A.2d 606 (Del. 2003) ........................................................................................ 19

*Weiner v. Klais & Co., Inc.,*
    108 F.3d 86 (6th Cir. 1997) ....................................................................................... 4

*Wellman v. Dickinson,*
    682 F.2d 355 (2d Cir. 1982)..................................................................................... 17

*Wilton v. Seven Falls Co.,*
    515 U.S. 277, 289 (1995).......................................................................................... 20

*Zirn v. VLI Corp.,*
    681 A.2d 1050 (Del. 1996) ....................................................................................... 11

**Other Authorities**

28 U.S.C.A. § 2201(a) (2007)......................................................................................... 18

29 U.S.C.A. § 1162(3) (1997)......................................................................................... 20

Defendant Romeo Kreinberg, by his attorneys Arkin Kaplan Rice LLP, respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rules of Civil Procedure 12(b)(6), to dismiss the counterclaims asserted against him by The Dow Chemical Company ("Dow" or the "Company").

## INTRODUCTION

The dispute occasioning this action, as well as two others,[1] arises from the precipitous termination of Romeo Kreinberg, a distinguished senior executive and 30-year employee of Dow. The instant motion is directed at the facial inadequacies of the counterclaims filed by Dow with this Court, claims which – though long on hyperbole and innuendo – are devoid of a single fact reflecting how Kreinberg breached any obligation owed to his employer.

In contrast to the defamatory statements it made to the media and its investors regarding the reasons for Kreinberg's termination, Dow does not allege that Kreinberg, at any point in time, participated in or influenced a hostile bid effort targeting the Company. To the contrary, Dow's claim for relief rests solely on the notion that Kreinberg had a duty to disclose "any information" about "discussions" he may have had with unidentified "third parties" regarding "potential transactions" that might involve it. Of course, no fiduciary maintains a legal "duty to speak" as to each and every meeting in which it might participate relating to its principal – and for all of Dow's artful pleading, its Counterclaims fail to show the "discussions" at issue here are any different.

---

[1]     Dow commenced an action against Kreinberg in the Eastern District of Michigan on the same day the instant case was filed. *See The Dow Chemical Company v. J. Pedro Reinhard, et al.,* 07-CV-12012 (TLL) (E.D. Mich. filed May 8, 2007). This is far from coincidental; rather, Dow lulled Kreinberg into delaying his case by proposing, on the afternoon of May 7, that the parties meet to discuss settlement at 3:00 p.m. the next day. Dow then filed a litigation in the Eastern District of Michigan on the morning of May 8. The Counterclaims Dow brings here mirror those maintained in that action, which Kreinberg moved to dismiss on June 19, 2007.

1

Dow's Counterclaims likewise fail to cite to any material fact reflecting what Kreinberg allegedly knew (and withheld) that the Company did not know. This is critical given that, well before Kreinberg's termination, Dow knew:

- Ian Hannam of JP Morgan was said to be the "mastermind" behind the potential takeover scheme targeting Dow;

- Henry Kravis of Kohlberg Kravis Roberts was said to have taken "personal charge" of financing the bid efforts; and

- Other likely investors included individuals or entities from Saudi Arabia, Kuwait, Bahrain, Qatar, UAE and Oman.

Kreinberg cannot be said to have a duty to speak regarding this or any other information already known to Dow.

In any event, even assuming a duty to disclose exists here – which it does not – Dow's claim fails in the absence of any allegation at all as to how Kreinberg breached this duty. The Company never identifies the substance, let alone the particulars, of the "discussions" in which Kreinberg purportedly participated, when or where these discussions occurred, with whom Kreinberg spoke, or how he benefited by his alleged "non-disclosure." Nor does Dow draw any nexus between any harm it allegedly suffered and Kreinberg's alleged "misconduct." Dow's cloak-and-dagger pleading fails to state a viable cause of action for breach of fiduciary duty.

Dow's remaining Counterclaims should likewise be dismissed. As described more fully below, its breach of contract claim fails to provide any notice to Kreinberg as to which of his Equity Awards are at issue in this litigation. Further, Dow's requests for declaratory judgment are either duplicative to relief sought elsewhere in the pleading or a manipulation of the purpose and remedies afforded by the Declaratory Judgment Act.

## FACTS

To the extent this Court finds any of them well-pleaded, the following factual allegations must be assumed true on this motion to dismiss:

### A.    *Rumors of a Hostile Bid and Dow's Response*

Dow claims that from January to April of 2007, disruptive rumors regarding a potential takeover bid directed at the Company were published by the media.[2] (Dow's CClaims ¶12.) The first of these was printed by the *Financial Times* on January 18, 2007, when it was reported that "talk in the marketplace was that a consortium of private equity groups was working on a break-up bid for Dow Chemical." (Dow's CClaims ¶13, referencing Ex. A to the Solbakken Decl.) The substance of this article was "disruptive and a matter of great concern" for the Company. As a result, Dow commenced an investigation to determine (i) "whether there was a basis for these rumors" and (ii) to determine "the source" of these reports. (Dow's CClaims ¶14.)

On February 25, 2007, the British tabloid *Sunday Express* printed another article identifying the potential for a buyout effort targeting Dow. The article stated in particular that:

> Dow Chemical looks set to become the target of the world's largest-ever leveraged buyout . . . .
>
> An approach worth up to $54 billion [ ] is expected to come from **a combination of global investors and American private equity giants that are likely to include powerful players such as KKR, Blackstone and Carlyle Group.**

(*See* Dow's CClaims ¶16, referencing Ex. B to Solbakken Decl. (emphasis added).) In response to this publication, Dow continued its "vigorous[ ]" investigation as to the basis and source of the

---

[2]    Dow's Counterclaims reference four articles in particular, which are attached hereto to the Declaration of Lisa C. Solbakken, dated July 10, 2007 (hereinafter, "Solbakken Decl."), as Exhibits A-D. This Court may consider these on this motion to dismiss because Dow refers to and relies on them throughout its pleading. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997). As the Sixth Circuit recognized, a contrary rule would allow plaintiffs with legally deficient claims to survive dismissal "simply by failing to attach a dispositive document upon which it relied." *Id.; see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

rumored buyout effort. Part of this investigatory process included directing inquiries to the "investment banking and finance community." (Dow's CClaims ¶17.)

Three weeks later, on March 12, 2007, London's *Evening Standard* reported that:

> [B]ankers in London are assembling the largest buyout the world has ever seen. It is the much-rumored offer for Dow Chemical in the U.S. The [ ] deal . . . **is being masterminded by Ian Hannam out of JP Morgan in London.**
>
> **An investment fund of a Gulf State is putting up over $10 billion of equity and the usual suspects, Kohlberg Kravis Roberts – with Henry Kravis taking personal charge – are arranging more than $50 billion of Debt . . .**

(*See* Dow's CClaims ¶18, referencing Ex. C to Solbakken Decl. (emphasis added).) The article further states that "[s]o massive and complex is the transaction, . . . **the JP Morgan office is doing little else.**" (*See* Ex. C to Solbakken Decl. (emphasis added).) This report caused Dow to continue its "quest" to determine the validity and source of the rumor of the reported takeover scheme.

Finally, on April 8, 2007, the *Sunday Express* ran another story describing a potential Dow takeover effort. (Dow's CClaims ¶22.) This report stated that a hostile bid for Dow was expected from "a consortium of Middle Eastern investors and buyout firms," that obtained "[a]t least half of the[ir] capital [from] investors from Saudi Arabia, Kuwait, Bahrain, Qatar, UAE and Oman, with the rest contributed by a number of U.S. buyout firms, including KKR." The paper further indicated that "stories have also circulated that Dow was in joint venture talks with India's Reliance Industries." (*See* Ex. D. to Solbakken Decl.)

Significantly, this article reported that Dow was thought to be advised "on a bid defence" by Goldman Sachs. The *Sunday Express* also noted that it first reported the Company was "in

play" back in February, when it exposed that a consortium of investors was "being advised by JP

Morgan Chase in London." (*See* Ex. D. to Solbakken Decl.)

### B.    *Dow's Andrew Liveris Meets with the Bank's CEO*

The day after the April 8th *Sunday Express* article was disseminated, and nearly a month

after JP Morgan's Ian Hannam was publicly named as the rumored takeover's mastermind,

Andrew Liveris met with the CEO of a "major international financial institution" (described only

as the "Bank") for dinner. (Dow's CClaims ¶26.)  What Dow's CEO allegedly learned from the

Bank's CEO at this dinner and the day after is critical to the Company's Counterclaims and the

instant motion.

Given Dow's pleading contortionism, these allegations warrant full reproduction here.

On the evening of April 9th:

> the Bank's CEO explained that the Bank's London affiliate had
> been working on behalf of certain Middle Eastern investors **on
> potential major transactions involving Dow**.  The Bank's CEO
> **subsequently explained that a variety of potential transactions
> were being discussed, including a purchase of Dow in its
> entirety.**  He also revealed that **people close to Dow were
> involved in the discussions,** and he committed to identifying who
> those persons were.

(Dow's CClaims ¶26 (emphasis added).)  Allegedly, the next day, the Bank's confession

continued:

> [T]he Bank's CEO called Dow's CEO and identified [ ] Kreinberg
> as [one of] **the Dow employees involved in the discussions with
> third parties about a major transaction involving Dow**.  He also
> told Dow's CEO that [Kreinberg] **had discussions with
> representatives of the Bank's London affiliate**.

(Dow's CClaims ¶27 (emphasis added).)  According to Dow, then, by April 10, 2007, Andrew

Liveris learned the following from the Bank's CEO:

(1)    The Bank – not Kreinberg – was working on behalf of Middle Eastern investors
on potential major transactions involving Dow;

5

(2)     The Bank – not Kreinberg – was "discussing" a "variety of potential transactions," including a purchase of Dow in its entirety;

(3)     "[P]eople close to Dow" were "involved" in at least some or all of the Bank's "discussions."

(4)     Kreinberg was "involved" in discussions with "third parties" about "a major transaction involving Dow" – the nature of which is unknown; and

(5)     Kreinberg "had discussions with representatives" of the Bank – who these representative are, when these discussions occurred, and the substance of that which was discussed with these "representative" is a mystery.

Dow does not state that Kreinberg played any specific role in, or that he was even aware of, the Bank's takeover efforts and its relationship with Middle Eastern investors. Further, Kreinberg's discussions regarding "a major transaction involving Dow" – which is never said to be a hostile bid – could have been with: (a) the "Middle Eastern investors"; (b) private equity firms with which they associated; (c) Reliance Industries (as referred to by the *Sunday Express* on April 8, 2007); or (d) some as of yet unidentified group.

The Counterclaims also fails to state how, if at all, any of the information regarding a potential takeover that was obtained from the Bank's CEO differs from what Dow already knew as the result of media reports and/or its investigation into a rumored bid. Likewise, the Company does not identify the individuals to whom it directed inquiries during its investigation, or what was learned by Dow, and at what point in time. It is unknown if or when the Company contacted the private equity firms identified by the media, Henry Kravis of KKR in particular, or even Ian Hannam of JP Morgan, the alleged "mastermind" of the rumored takeover scheme. Last, not once does Dow state that it ever asked Kreinberg a single question in connection with its investigation into a potential hostile takeover effort.

### C.    *Kreinberg's Termination*

Liveris "informed" Dow's Board of what he learned from the Bank's CEO on April 11,

2007. Based on the "many questions" of the Board and the "credibility of the information

provided to Dow's CEO by the Bank's CEO," the Board voted to terminate Kreinberg. (Dow's

CClaims ¶29.) Dow does not state whether the Board ever investigated the veracity of the

hearsay conveyed by Andrew Liveris prior to making this decision.

The next day, on April 12, 2007, Kreinberg was called into a meeting at which he was

accused of "misconduct," the substance of which is not provided. In response, Kreinberg

"denied the allegations against [him] without offering any sort of explanation." (Dow's CClaims

¶31.) As a result, Liveris and Dow's outside counsel called the Bank's CEO and the Bank's

General Counsel, who "reconfirmed" the information previously given. (Dow's CClaims ¶32.)

### D.    *Dow's Injury*

Dow claims the Company was harmed by the press reports related to a potential takeover,

which "clouded Dow's future, distracted Dow from its business objectives, and roiled its

management and employees." (Dow's CClaims ¶12.)  Such rumors led to what Dow

characterizes as an "extraordinarily distracting" search as to their source and validity. (Dow's

CClaims ¶28.)  Dow's Counterclaims never state that Kreinberg was the source of these rumors;

nor does it state whether its investigation into these rumors would have been in any way altered

by the information allegedly withheld by Kreinberg. Harm to Dow's shareholders is not alleged.

### E.    *Dow's Claims*

Dow claims Kreinberg breached his fiduciary duties by failing to disclose "any

information" about "discussions" he had for "[his] own benefit" with unidentified "third parties"

regarding "potential transactions" involving the Company. (Dow's CClaims ¶49.) Dow also

alleges Kreinberg breached the Company's 1988 Equity and Award Plan (the "1988 Plan") and

other related agreements by which he received performance shares, stock options, and deferred stock (collectively, the "Equity Awards"). (Dow's CClaims ¶56, 58, 60.)

Dow's breach of contract action seeks to "claw-back" value Kreinberg realized pursuant to these contracts. (Dow's CClaims ¶¶55, 56, 58, 60.) Likewise, Dow seeks a judgment from this Court declaring that: (1) it is entitled to such "claw-back" payments, and (2) that it has no further payment obligations to Kreinberg under the terms of the 1988 Plan and the Equity Awards. (Dow's CClaims ¶¶64, 69.) Finally, Dow seeks a judgment confirming the propriety of its decision to decline Kreinberg notice of the termination of his COBRA benefits under his medical plan given that the Company has determined he has engaged in "gross misconduct." (Dow's CClaims ¶74(a).)

## STANDARD OF REVIEW

In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the Supreme Court clarified the standard applicable to a motion to dismiss pursuant to Rule 12(b)(6). In order to survive such a motion, a plaintiff's grounds for relief must amount to something more "than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 1964-65 (citation omitted). Further, while well-plead allegations will be assumed as true, these allegations nonetheless "must be enough to raise a right to relief *above the speculative level*." *Id.* at 1965 (citation omitted).

## ARGUMENT

## I.    DOW FAILS TO PLEAD A BREACH OF FIDUCIARY DUTY.

Dow's breach of fiduciary duty claim against Kreinberg is one predicated upon willful concealment or silence in the face of the duty to speak,[3] (*see* Dow's CClaims ¶¶14, 15, 17, 19,

---

[3]     Though he is alleged to have been "armed with knowledge of Dow's innermost secrets," Dow never suggests Kreinberg disclosed to a third-party confidential Company information. (*See, e.g.*, Dow's CClaims ¶11.)

23, 25), characterized by the Company as "a course of deception and betrayal." (Dow's CClaims

¶11.) Its claim is thus fraud-based, and subject to the particularity requirements of Rule 9(b).

*See Rogers v. Baxter Intern., Inc.*, 417 F. Supp. 2d 974, 984 (N.D. Ill. 2006) (finding that Rule

(9)(b) applies where a pleading "alleges conduct that is classically associated with fraud,"

irrespective of whether it uses the terms "fraud" or "fraudulent"). Even upon applying the more

liberal standards provided by Rule 8(a), however, the Company's allegations are insufficient.

*See Bell Atlantic Corp.*, 127 S. Ct. at 165 n.3 ("Rule 8(a)(2) [ ] requires a showing, rather than a

blanket assertion, of entitlement to relief. Without some factual allegation in the Counterclaims,

it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of

the nature of the claim, but also grounds on which the claim rests.") (citation and internal

quotation marks omitted).

### A.    Dow Fails To Set Forth Facts Giving Rise To A Legal Duty to Disclose.

Generally, silence in the absence of a defined disclosure obligation is not actionable. *See,*

*e.g., Chiarella v. U.S.*, 445 U.S. 222, 228 (1980) ("one who fails to disclose material information

prior to the consummation of a transaction commits fraud only when he is under a duty to do

so"). Thus, it is only where there first exists a legal duty to speak that a defendant's alleged non-

disclosure forms the basis of a claim. *See id.* Case law defines those circumstances that give rise

to a duty to speak when considering an alleged breach of such obligation. *See, e.g., Metro*

*Communication Corp. BVI v. Advanced Mobilecom Technologies Inc.*, 854 A.2d 121, 155 (Del.

Ch. 2004) (explaining that Delaware law "has evolved to the point in which there are specific

standards that govern the liability of entity fiduciaries . . . for [ ] non-disclosures to entity

owners.")

9

Delaware law generally provides for three instances where a fiduciary's failure to disclose could give rise to a breach of duty.[4] First, full disclosure of all material information must be provided where shareholder action is sought by the fiduciary. *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (stating that the duty of disclosure "inheres any time a corporate board of directors seeks stockholder action") (citations omitted). Second, where a fiduciary "voluntarily undertake[s] to make certain disclosures to [ ]stockholders, [she is] obligated, under the so-called duty of complete candor, to disclose all material facts" related to that issue. *Ciro, Inc. v. Gold*, 816 F. Supp. 253, 266 (D. Del. 1993). Finally, a duty to disclose may arise where a fiduciary is aware of non-public information unknown to his beneficiary that is material to a transaction in which the beneficiary is participating, such as where the fiduciary maintains an undisclosed self-interest. *See Orman v. Cullman*, 794 A.2d 5, 22-23, 28 (Del. Ch. 2002) (noting that fiduciary breach may exist where an "interested director fail[ed] to disclose his interest in the transaction to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction"). As one Delaware court stated:

> [Fiduciaries have] an unremitting obligation to deal candidly with
> [ ] fellow directors. This obligation requires directors to take
> affirmative steps to disclose any interest they may have in a
> transaction. Absent special circumstances in which the board
> would have reason to expect earlier disclosure, however, a director
> has no duty to disclose his interest in a transaction until he seeks
> board approval of the transaction.

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 180-81 (Del Ch. 2005) (citations and internal quotation marks omitted).

---

[4]    Pursuant to the internal affairs doctrine, Delaware law applies to Dow's breach of fiduciary claim. *See First Nat'l City v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."); *see also Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 471 (W.D. Mich. 1997) (discussing Delaware's interest in application of its substantive law to a breach of fiduciary duty claim of Michigan corporation under New York conflicts-of-law principles; *see also Hart v. General Motors Corp*, 129 A.D. 2d 179, 185 (1st Dept. 1987).

It is only this last potential ground for a legal duty to speak that is implicated by Dow's claim. The Company does not claim a shareholder action was sought in connection with the information Kreinberg purportedly withheld. Nor does Dow appear to suggest "misdisclosure," or a breach of the duty of candor, upon Kreinberg providing some, though not all, of the information in his possession.[5]   Instead, it claims that Kreinberg had a duty to disclose "any information" he knew as a result of purported "third party discussions" in which he participated "for [his] own benefit" and to "advance [his own] agenda." (Dow's CClaims ¶ 49, 35.)  Dow states it was entitled to know of "any" information Kreinberg **might** have learned of these discussions, irrespective of whether it was gossip, speculation, or otherwise already known to the Company.

The Counterclaims' conclusory allegations fall short of giving rise to a duty to speak. Dow cites no fact suggesting how Kreinberg was to "benefit" or advance his personal agenda by withholding information from the Company.  Nor is there any suggestion that Kreinberg was on "both sides" of a transaction, contemplated or extant, that was discussed with third parties.  In the absence of such allegations, no duty to speak exists. *See Orman,* 794 A.2d at 29-30 (Del. Ch. 2002) (noting that naked assertions as to the existence of personal benefit are insufficient to support notion that a conflict of interest exists); *Minard v. Iazzetti*, No. CIV. A. 06-645 (MLC); 2007 WL 1462402, at *5 (D.N.J. May 15, 2007) (dismissing fiduciary duty claim in the absence of facts "showing that [defendant] received a personal benefit from the sale" at issue).

Moreover, no duty to speak may lie in the absence of a factual basis to conclude that Dow possessed information inferior to that purportedly withheld by Kreinberg.  Courts have made

---

[5]      To the extent Dow means to suggest that Kreinberg breached a "duty of candor" as a result of his failure to provide "any information" he knew related to rumored transactions at a Board meeting during which they were discussed, its claim fails given the admission that Kreinberg did not attend any such meeting.  (*See* Dow's CClaims ¶15.)

clear that no legal duty to disclose exists where the complaining party is aware of the information

withheld, or when relevant facts are reasonably available to it. *See Solomon v. Armstrong*, 747

A.2d 1098, 1131 (Del. Ch. 1999) (citation omitted) (no duty to disclose information where

complainant already had notice of the same); *see also Scarabello v. Reichle*, No. 93 C 4606,

1995 WL 153338, at *2 (N.D. Ill. Apr. 6, 1995) (no fiduciary duty to disclose information that

had already been disclosed); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)

(party's reasonable belief that other party has access to facts should excuse him from new

disclosures which reasonably appear to be repetitive).

The articles referenced by Dow's Counterclaims demonstrate that Dow knew critical data

relating to the rumored buyout efforts. For example, it knew that "private equity giants" such as

"KKR, Blackstone and Carlyle Group" were said to be involved, and that Henry Kravis was

"taking personal charge" of the planned acquisition. (*See* Ex. C to Solbakken Decl.) Further,

Dow knew that Ian Hannam of JP Morgan was the "mastermind" of the scheme. (*Id.*) So

educated was Dow, states the media, that it engaged Goldman Sachs to assist in its defense of a

buyout attempt. (*See* Ex. D. to Solbakken Decl.)

The Counterclaims make no suggestion that Kreinberg possessed information different

than (or even coming close to) the detail provided by these public reports. (*See* Dow's CClaims

¶¶ 14, 15, 17, 19, 23, 24, 25.)    There is, in short, no factual allegation asserted in support of

Dow's conclusion that Kreinberg, at some point in time, possessed information superior to that

held by it. As a result, no legal duty may be imposed on him. *See, e.g., Solomon*, 747 A.2d at

1131; *Scarabello*, 1995 WL 153338, at *2; *Seibert*, 586 F.2d at 952.

Finally, even upon review of the meager facts provided by Dow's Counterclaims, it is

clear that any information Kreinberg purportedly "withheld" is either immaterial and/or

12

speculative as a matter of law. *See, e.,g., TSC Indus., Inc.*, 426 U.S. at 448 (noting that materiality is required prior to imposing duty to speak, lest fearful management would "simply bury the shareholders in an avalanche of trivial information"); *Krim v. Pronet, Inc.*, 744 A.2d 523, 525 (Del. Ch. 1999) (dismissing "speculative disclosure claim concerning the existence, or lack thereof, of merger negotiations with third parties"). That is, that Kreinberg engaged in alleged conversation(s) relating to one or more "potential transactions" involving Dow with unidentified individuals at an undisclosed time does not and cannot form the basis of a disclosure obligation. *See, e. g., In re MONY Group Inc. Shareholder Litig.*, 852 A.2d 9, 30-31 (Del. Ch. 2004) (letter received from third party interested in merger was immaterial and not subject to a disclosure requirement); *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 275 (Del. Ch. 1989) (expression of interest in meeting to discuss merger is immaterial and does not give rise to disclosure claim).

**B.    Even Assuming A Legal Duty To Disclose Exists, Dow Fails To Set Forth Facts Identifying A Breach Of This Legal Duty.**

Even assuming Kreinberg maintained a duty of disclosure, the Counterclaims fail to allege any facts suggesting that he breached this duty. Under Delaware law "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory." *Loudon v. Archer-Daniels-Midland Company*, 700 A.2d 135, 140 (Del. 1977). Dow's claim fails to meet this standard.

As indicated above, Dow claims Kreinberg failed to disclose "any information" he had in his possession after "discussions" with unnamed "third parties" regarding "potential transactions" involving the Company. No offer for Dow is said to have been made to Kreinberg, and there is no suggestion that he influenced any alleged takeover attempt. To the contrary, Dow never identifies the substance of such "discussions," the nature of the "potential transaction" said

to be at issue, when or where such discussions occurred, or to whom Kreinberg spoke. There is, in fact, no assurance from Dow as to whether information forming the basis of its non-disclosure claim actually exists in the first place. (*See* Dow's CClaims ¶¶ 14, 15, 17, 19, 23, 24, 25 (repeating that Kreinberg failed to disclose to Dow "**any** knowledge" he may have had in his possession) (emphasis added).) The Company does not adequately plead facts supporting its claim of a breach of the duty to disclose. S*ee Krim*, 744 A.2d at 528 (dismissing disclosure claim where "[p]laintiff offers only conclusory allegations about [ ] 'discussions or negotiations' and fails to plead any material facts regarding potential suitors. . . .").

Of course, Dow does try to draw out a negative implication by stating that, in addition to the unidentified third parties with whom he spoke, Kreinberg also communicated with the representatives of the Bank's London affiliate (at one time or another). Because the Bank's London affiliate was involved in putting together a bid for Dow, the Company encourages the Court to conclude that, so too, was Kreinberg.

These conclusory allegations do not save Dow's claim. The Counterclaims never connect Kreinberg to any part of the takeover scheme allegedly confessed by the Bank's CEO.[6] (Dow's CClaims ¶26, 27.) As with Dow's other allegations, the substance of these purported discussions, with whom they were with, and when they occurred is never identified. The Company's effort to state a claim upon conduct by baseless inference must fail. *See Louden,* 700 A.2d at 140.

---

[6]    Even if Dow made such a connection, this alone would not adequately plead a breach. *See Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 408 (Del. 1985) (finding no of breach fiduciary duties where a fiduciary sold shares to acquiring corporation in support of takeover); *Wellman v. Dickinson*, 682 F.2d 355, 367 (2d Cir. 1982) (director is "under no fiduciary duty to reveal . . . his intention to use his [ ] holdings to effectuate a third-party takeover of the company . . . or to refrain from promoting a takeover by a third-party").

### C.    *Dow Fails to Allege Causation.*

Finally, Dow's breach of fiduciary duty claim must fail because there exists no nexus between Kreinberg's alleged conduct and any harm Dow purportedly suffered. Where, as here, a disclosure claim "does not contemplate stockholder action . . . . [a] plaintiff [ ] will have to plead causation and identify actual quantifiable damages in order to plead sufficiently" a cause of action. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 917 (Del. Ch. 1999); *see also In re J.P. Morgan Chase & Co. Derivative Litig.*, 906 A.2d 766, 773 (Del. 2006) (noting that compensatory damages in a disclosure claim must be "logically related to the harm for which compensation is being awarded"). Thus, Count I of Dow's pleading must state facts indicating that the conduct that  breached this duty caused its loss or harm. *O'Reilly,* 745 A.2d at 917; *see In re J.P. Morgan Chase,* 906 A.2d at 773.

Here, the only harm Dow claims stems from press reports – not Kreinberg. In particular, the Counterclaims states that the published buyout rumors "clouded Dow's future, distracted from its business objectives, and roiled its management and employees." (Dow's CClaims ¶12.) Kreinberg is never said to have been the source of these rumors, or otherwise in any position to control them. Further, Dow does not state how, if at all, its investigatory "quest" would have been obviated or otherwise altered as the result of the disclosure sought from Kreinberg (again, the substance of which is never identified). (*See, e.g.,* Dow's CClaims ¶49.) Finally, Dow's shareholders are never said to have suffered any harm by Kreinberg's conduct or the rumors relating to a potential buyout. In the absence of any allegation from which causation might be established, Dow's claim should be dismissed.

## II.    DOW'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED.

In order to survive a motion to dismiss for failure to state a breach of contract claim a plaintiff must:  (1) plead an existing contract; (2) a breach of a contractual obligation by the

15

defendant; and (3) resulting damage. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Dow makes only the most superficial efforts at pleading these elements.

According to the Counterclaims, on April 12, 2007, Dow's Compensation Committee authorized "certain employees of Dow to take all actions necessary and sufficient to freeze, terminate and/or 'claw-back' any and all remuneration and benefits" Kreinberg received from the pursuant to the terms of the Equity Award. (Dow's CClaims ¶ 44.) Dow alleges that because of this finding, Kreinberg breached his obligation to repay Dow the amounts it is owed under these agreements. (Dow's CClaims ¶¶ 56, 58, 60.)

Even under the liberal pleading standards afforded this claim, the Company's breach of contract action should fail. First, Dow never identifies what actions were authorized by its Compensation Committee, and how, if at all, Kreinberg failed to respond to these actions. Second, the Counterclaims make clear that only "certain" of the Equity Awards received by Kreinberg include a "claw-back" provision. (*See* Dow's CClaims ¶¶ 39, 40, 41.) By implication then, some of the Equity Awards received by Kreinberg do not contain a "claw-back" provision. Despite the foregoing, Dow apparently seeks to recover certain undefined amounts from "each" one of the award grants received by Kreinberg for a three-year period. (Dow's CClaims ¶¶54, 57, 59.) Kreinberg should not be required to respond to Dow's pleading or submit to discovery without any notice of which of the contracts (or award benefits) Dow means to implicate by its cause of action and which it does not. *See Conley v. Gibson*, 355 U.S. 41, 47 (1957) (a plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests"). Count II should be dismissed until such time as Dow provides this de minimis amount of notice relative to its breach of contract claim.

16

### III.  DOW'S DECLARATORY JUDGMENT CLAIMS ARE CONTRARY TO THE DJA.

The Declaratory Judgment Act (the "Act") provides in pertinent part:

> In a case of actual controversy within its jurisdiction [ ] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C.A. § 2201(a) (2007). The Act is "an enabling Act" that gives the district court an

"opportunity" to exercise jurisdiction over a case it deems "fit." *Wilton v. Seven Falls Co.,* 515

U.S. 277, 289 (1995) (citing *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241-43 (1952)).

The Act does not grant a litigant an absolute right to bring a declaratory judgment action. To the

contrary, a court may, within its broad discretion, decline jurisdiction and dismiss a declaratory

judgment action, even when it presents a justiciable controversy. *See Wilton,* 515 U.S. at 289

(citation omitted).

When addressing the "unique breadth of [ ] discretion to decline to enter a declaratory

judgment," the *Wilton* Court considered and rejected the argument that district courts may

decline declaratory judgment jurisdiction only for "compelling reasons" or in "exceptional

circumstances." *Id.* Indeed, the Court further stated that the Act's discretionary jurisdiction

should yield to "considerations of practicality and wise judicial administration." *Id.* Generally, a

district court should consider the following in assessing whether to exercise its discretion in such

cases:

(1)  whether the judgment would settle the controversy;

(2)  whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3)  whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata "; and

(4)  whether there is an alternative remedy that is better or more effective.

17

*See Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003).[7]

### A.    Counts III And IV Of The Counterclaims Are Duplicative To Dow's Contract Claim And Should Be Dismissed.

At a meeting held on April 12, 2007, Dow's Compensation Committee found that Kreinberg engaged in conduct harmful to the interests of Dow. (Dow's CClaims ¶¶ 44, 55.) As a result, it authorized "certain officers of Dow to take all actions necessary and sufficient to 'claw-back' any and all remuneration and benefits" Kreinberg realized pursuant to the 1988 Plan and the Equity Awards Kreinberg received during his employment. (Dow's CClaims ¶44.)

Count II of Dow's Counterclaims seeks recovery of these "claw-back" amounts due to Kreinberg's alleged breach of the 1988 Plan and the Equity Awards. Counts III and IV of Dow's pleading seek a judgment from this Court declaring that Kreinberg: (1) required to pay such "claw-back" amounts; and (2) that Dow has no further obligation to him as the result of his termination and related contractual breaches. (*Compare* Dow's CClaims ¶69 *with* Dow's CClaims ¶¶ 64, 74.)

The relief sought by Dow in Counts III and IV of Dow's Counterclaims are entirely duplicative to that sought by Count II. Indeed, declaratory judgment is simply unnecessary where, as here, "whether the parties entered into enforceable contracts and, if so, whether defendant[ ] breached the contract[ ] . . . will be resolved in the context of a breach of contract" claim. *Kougl v. Xspedius Mgmt. Co.*, No. CIV.A. 3:04 CV 2518-D, 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005). That is, such declaratory judgment claims alone add nothing to the controversies existing between the parties, and otherwise serve no useful purpose in the instant litigation. *See Next G Network of New York, Inc. v. City of New York,* 03 CIV 9672, 2006 WL

---

[7]    Courts also consider whether a declaratory action would increase friction between federal and state courts; this factor is irrelevant here as Dow's breach of contract action is pending in this same case.

538189 (S.D.N.Y. Mar. 6, 2006), at *8 (citing *Florists' Transworld Delivery, Inc. v. FleuropInterflora*, 261 F. Supp. 2d 837, 847 (E.D. Mich. 2003) (additional citation omitted)); *Aslanukov v. American Express Travel Related Services Co., Inc.,* 426 F. Supp. 2d 888, 891 (W.D.Wis. 2006); *Pakideh v. Ahadi*, 99 F. Supp. 2d 805, 809 (E.D. Mich. 2000). Counts III and IV of Dow's pleading seek the same relief as Count II – they are redundant and should be dismissed.

### B.    *Count V of the Counterclaims Should Be Dismissed.*

Finally, Count V of Dow's pleading asks the Court for a judgment declaring it has no obligation to provide Kreinberg notice of his rights under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") because Kreinberg was terminated for "gross misconduct" – as a result, no such notice is necessary. *See* 29 U.S.C.A. § 1162(3) (1997) (specifically excluding "gross misconduct" as a qualifying event giving rise to the obligation of notice prior to terminating benefits). Dow states that Kreinberg has denied having engaged in any "misconduct," so it is entitled to preemptive absolution of any future alleged breach of its statutory obligations. To be clear, then: Dow does not state that Kreinberg suggested he will challenge the decision by the Company to forgo COBRA notification under the statute. Rather, the Company anticipates that Kreinberg will take this position at some point in the future.

Of course, the DJA is a tool available to claimants only where there exists an actual controversy between the parties. *See Aetna Life Ins., Co. v. Haworth,* 300 U.S. 227, 239 (1936); *Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1189 (7th Cir. 1980); *Aetna Cas. & Sur. Co. v. Sunshine Corp.*, 74 F.3d 685, 687 (6th Cir 1996). When making this assessment, courts consider whether the facts alleged "show that there is a substantial controversy [ ] between parties having adverse legal interests [ ] of sufficient immediacy and reality to warrant declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil. Co.*, 312 U.S. 270, 273 (1941). Advisory opinions on

19

hypothetical facts are forbidden. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).

Count V of Dow's Counterclaims is an egregious manipulation of this procedural remedy. At best, the Company seeks confirmation from this Court as to future conduct Kreinberg may undertake. This is a request for an advisory opinion on a set of hypothetical facts, and is contrary to the purpose of the DJA and Article III's requirements generally. *See Maryland Casualty Co. v. W.R. Grace & Co.,* 88 CIV 2613, 1996 WL 109068 (S.D.N.Y. Mar. 12, 1996), at \*2-\*3; *Mozdzierz Consulting, Inc. v. Mile Maker, Inc.*, No. 04-CV-74925-DT; 2006 WL 799222, at \*4 (E.D. Mich. Mar. 28, 2006).

In any event, COBRA is designed to protect employees and their dependents when experiencing a loss of health coverage, not to provide a company with $49 billion in annual sales a portal to the federal courts by manufacture of a federal question. The onus is on Kreinberg to determine if his rights were violated under COBRA, and what remedy, if any, he should pursue as a result. Dow identifies no "additional harm, [other than perhaps] merely waiting for [Kreinberg] to sue, [that] will befall [it]" in the absence of extraordinary relief afforded by declaratory judgment. *AmSouth Bank v.* Dale, 386 F.3d 763, 786-87 (6th Cir. 2004). This Court should dismiss Count V of Dow's Counterclaims.

## CONCLUSION

For the reasons set forth above, Defendant respectfully submits that Dow's action should

be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated:  New York, New York
         July 10, 2007

                                        Respectfully submitted,

                                        ARKIN KAPLAN RICE LLP


                                        By: /s/ Lisa C. Solbakken_____
                                             Stanley S. Arkin (SA-1737)
                                             Lisa C. Solbakken (LS-8910)
                                             Barrett Prinz (BP-7167)

                                        590 Madison Avenue
                                        35th Floor
                                        New York, New York 10022
                                        (212) 333-0200 (telephone)
                                        (212) 333-2350 (facsimile)

                                        *Attorneys for Plaintiff Romeo Kreinberg*